F. C. PUBLICATION LIQUIDATING CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 74149. Filed August 11, 1961.

*Laurence F. Casey, Esq.,* for the petitioner.
*Herbert Rothenberg, Esq.,* for the respondent.

TRAIN, *Judge:* Respondent determined deficiencies in petitioner's income tax and additions to tax under section 6651(a) of the Internal Revenue Code of 1954 for the years and in the amounts as follows:

| Fiscal year ended— | Deficiency | Additions to tax, sec. 6651(a) |
|---|---|---|
| Mar. 31, 1954 | $190,050.11 | |
| Mar. 31, 1955 | 38,772.12 | $1,938.61 |
| Apr. 1 to June 7, 1955 | 1,803.46 | 90.17 |

The sole question in this case is whether petitioner can carry over certain operating losses and unused excess profits tax credits.

### FINDINGS OF FACT.

Some of the facts are stipulated and are hereby found as stipulated.

Park Magazine, Inc. (hereinafter referred to as Park Magazine), was incorporated under New York law on April 10, 1949, for the purpose of publishing and distributing a monthly magazine called Park East. Its principal business activity was stated in its Federal income tax returns for the taxable years ended March 31, 1951 through 1954, as "magazine publisher." Originally the authorized capital stock consisted of 100, no-par-value shares which, immediately prior to the merger involved herein, was held by Ernest Lilienthal (hereinafter referred to as Lilienthal).

For the taxable years involved, Park Magazine sustained net operating losses as follows:

*Fiscal year ended Mar. 31—*

| | |
|---|---|
| 1951 | $150,245.03 |
| 1952 | 232,705.62 |
| 1953 | 360,771.95 |

Park East, subtitled "The Magazine of New York," was directed primarily to New York City readers having sophisticated tastes. While it enjoyed nationwide circulation, roughly 39 percent thereof was derived from within New York State. It sold on newsstands for 25 cents per copy and the United States subscription price was $3 per year. A typical issue comprised 74 pages, 15 of which (including the cover) represented paid advertising.

The Family Circle, Inc. (hereinafter referred to as Family Circle), was incorporated under Delaware law on November 29, 1939, and from its inception until June 30, 1953, engaged in publication and distribution, principally through chain grocery stores, of the monthly magazine called The Family Circle. As of June 30, 1953, its capital stock consisted of 87,804 shares of $1-par-value common stock held by some 12 stockholders. Its pretax net income for the 7 months ended June 30, 1953, was $443,079.58. Prior to the merger with Park Magazine, Family Circle's balance sheet showed assets of $2,947,055.60.

Distribution of The Family Circle magazine was by direct sales to 14 large grocery store chains which in turn sold the magazine to their own customers and consumers. The advertising was largely of food and consumer products. In 1953, its net paid circulation was approximately 4 million copies.

In 1953 Family Circle's president was Palmer K. Leberman (hereinafter referred to as Leberman). He had been employed by Family Circle and predecessors since 1934, except for wartime service in the United States Navy. The stockholders of Family Circle were as follows:

| Name | Number of shares | Name | Number of shares |
|---|---|---|---|
| Ince & Co., nominee for Charles E. Merrill. Trustee | 65, 000 | A. B. Grimes | 877 |
| | | Jan Mayer | 877 |
| P. K. Leberman | 8, 771 | Richard Sanderson | 877 |
| R. A. Magowan | 3, 508 | Franklin C. Eden | 250 |
| Harry Evans | 3, 508 | Helen C. Eden | 250 |
| C. J. Schaefer | 2, 193 | George T. Phillips | 100 |
| Baltic Securities Corporation | 1, 593 | | |

In May 1953 Lilienthal and Alexander Tailleur (hereinafter sometimes referred to as Tailleur), then president of Park Magazine, visited Leberman, to suggest a combination of Park Magazine with Family Circle. Prior to this time Park Magazine had discharged most of its employees and terminated most of its contracts. At the same time Tailleur gave Leberman a brochure outlining the history of Park Magazine, its objectives and policies regarding advertising and reader appeal, and its potential earnings, assuming substantial additional capital investment and based upon alternative assumptions regarding advertising volume and rates.

Leberman had Price Waterhouse & Co., certified public accountants for Family Circle, examine the accounts of Park Magazine. He also engaged Bert Garmise (hereinafter referred to as Garmise), a publications circulation expert, on a month-to-month basis to go over the circulation records of Park East both as to subscriptions and newsstand sales and render an opinion as to whether or not an Audit Bureau of Circulations' guaranteed circulation of approximately 50,000 copies per issue of Park East could be maintained without spending too much for promotion. Garmise specialized in newsstand circulation services for publishers distributing through the American News Company, Inc. (hereinafter referred to as American News). American News was hired by Family Circle as the wholesale distributor of Park East, and the contract was terminable by either party on 60 days' notice.

The following was the balance sheet of Park Magazine as of June 30, 1953 (prior to the merger):

## ASSETS

| | |
|---|---:|
| Cash_____ | $905. 41 |
| Accounts receivable from advertisers and newsstand sales, less allowance for doubtful accounts and returns_____ | 6, 947. 52 |
| Inventory of manuscripts and artwork, at cost_____ | 3, 033. 73 |
| Postage and other deposits_____ | 143. 65 |
| Furniture and fixtures, less accumulated depreciation of $828.70_ | 1, 935. 39 |
| | |
| Total assets_____ | 12, 965. 70 |

## LIABILITIES AND CAPITAL

Liabilities:

| | |
|---|---:|
| Note payable to bank_____ | 7, 075. 73 |
| Account payable to the Family Circle, Inc._____ | 848. 88 |
| Other accounts payable, accrued expenses, and taxes_____ | 887. 62 |
| Estimated rebates to advertisers_____ | 5, 000. 00 |
| Estimated unearned subscription income_____ | 31, 867. 44 |
| | |
| | 45, 679. 67 |

Capital:

Capital stock:

| | | |
|---|---:|---:|
| Authorized—100 shares, no par value_____ | _____ | |
| Issued and outstanding—100 shares at stated value_____ | $20, 000. 00 | |
| Capital surplus_____ | 782, 000. 00 | |
| | | 802, 000. 00 |

Earned surplus (deficit):

| | | |
|---|---:|---:|
| Balance, Mar. 31, 1953_____ | (809, 040. 41) | |
| Loss for the 3 months ended June 30, 1953: | | |
| Advertising, subscription, newsstand sales, and miscellaneous income, less agency commissions and returns_____ $12, 561. 16 | | |
| Production, editorial, circulation, advertising, promotion, and general and administrative expenses_____ (53, 939. 94) | | |
| | (41, 378. 78) | |
| Other charges and credits: | | |
| Provision for estimated unearned subscription income_____ | (30, 000. 00) | |
| Trade name, copyrights, and goodwill, written off_____ | (7, 000. 00) | |
| Provision for estimated rebates to advertisers _____ | (5, 000. 00) | |
| Cancellation of accrued interest on notes payable_____ | 57, 705. 22 | |
| | | (834, 713. 97) |
| | | 12, 965. 70 |

During the latter part of May 1953, Leberman began discussions regarding Park East with Graham Johnston (hereinafter referred to as Johnston) who was the publisher of Promenade Magazine (hereinafter referred to as Promenade). Promenade was distributed to approximately 13 high-quality hotels, e.g., Waldorf-Astoria, St. Regis, The Plaza, in New York, and in Washington and Puerto Rico. Promenade was sold directly to the hotels involved and then distributed free to their guests. Promenade Magazines, Inc. (hereinafter referred to as Promenade, Inc.), had no experience with subscription or newsstand circulation. Leberman contacted Johnston to discuss possible combination of the editorial and advertising staffs of Promenade, Inc., with Park East. The Family Circle was editorially a different type of magazine from Park East.

On June 11, 1953, R. R. Endicott (hereinafter referred to as Endicott), editor and a director of Family Circle, addressed the following memorandum to Leberman:

Since we last discussed PARK EAST and PROMENADE, I have been thinking about the various possibilities, with these conclusions:

(1) If it is true that there has been no clearcut Internal Revenue decision on a case of this kind, my guess is that our lawyers will advise that to make sure we are in the clear, or to improve the chances in our favor, we actually publish several issues of a magazine, or cause them to be published by someone else. And I would think that if this were the advice of the lawyers, our inclination would be to follow it, rather than to take the longer gamble of disregarding it and hoping for the best.

(2) The following, therefore, is based on the assumption that several copies of some magazine that can be considered a continuation of PARK EAST, or a successor to it, will be published by us or by someone we help finance.

On this assumption I recommend that we do as much as possible to keep ourselves out of any involvements that will make it necessary to explain publicly our connection with PARK EAST and that will interfere with what we have to do here at FAMILY CIRCLE, particularly in taking the time of our present staff or encroaching on our present limited office space. That is, if we must involve ourselves at all with people or office facilities, I urge that they be people in addition to those we already have and office space outside of our present offices.

But even doing it that way there would be at least these possibilities:

(a) A continuation of PARK EAST as a separate magazine, sold both by subscription and on newsstands, to be published by us or someone we designate, with our financing, but with the intention, admitted or not, of publishing only long enough to fulfill the legal requirements and with a minimum of loss. This course I do not favor.

(b) A magazine to succeed PARK EAST, with that or some other name, to be actually edited, produced, and sold by someone else, preferably PROMENADE, with our financing wholly or in part, and with the avowed intention of trying to make it a profitable undertaking, and continuing it beyond the time Internal Revenue would require. I favor this course over the one above from the standpoint of publishing ethics and of keeping ourselves from being criticized, but I do not have much hope for it from the point of view of probable profit compared to the amount of work that, in my opinion, would be necessary and the amount of money that would have to be risked.

I do not feel that PROMENADE in its present form can be sold either by subscription or on newsstands at 25 cents a copy in enough quantity to make it profitable, and I would not favor spending any of our money to try to find out. Neither do I feel that changing some of the material in the present PROMENADE, substituting for it something with less special interest, and adding 16, 24, or even 32 pages of additional material would necessarily make it salable by subscription or on newsstands, unless a sizable amount of money (well beyond the $3500 or $4000 that has been suggested as a fee for publishing the expanded magazine) were spent on personnel, promotion, and circulation effort. In my opinion, the figures that have been used so far to estimate the cost of this kind of venture are not realistic enough to show all that would be entailed, and the cost of it, in producing a larger magazine using PROMENADE's present editorial material and its personnel as a base. If we were to try to reestablish PARK EAST on something like its previous basis (subscription and newsstand) with 50,000 or more circulation, and with any chance of its succeeding, I estimate that it would cost somewhere between $10,000 and $15,000 a month for the additional editorial, circulation, promotion, and advertising personnel, additional editorial material, and additional circulation promotion. This would be in addition to whatever loss there might be after circulation and advertising revenue were applied against paper, production, and mailing costs.

The more I think about it, the more convinced I am that the people at PROMENADE have not had enough experience either with editing the kind of magazine I think would be necessary, or selling it by subscription and on newsstands, so that they could direct this kind of project and carry it out successfully with the addition of only a few fairly low-salaried people and buying a little additional editorial material. What would be necessary, in my opinion, would be almost a complete separate publishing setup in miniature within the present PROMENADE offices, with the second group under the general direction of PROMENADE, with or without advice from us.

If we are prepared to finance some such approach as this and carry it on for at least 12 issues, I think it might have some chance of success, but I don't feel that the probable profit is worth the gamble of money and time.

(c) What seems to me to be the best solution of all, considering what I assume to be the legal requirements and the risk of money, time, and reputation, is this:

Have a letter sent to the present subscribers of PARK EAST saying that their unexpired subscriptions will be fulfilled, perhaps with two issues for one, with copies of PROMENADE in its new PARK EAST edition which will have, in addition to all of the features of the present PROMENADE that are of general interest, new features that will increase the number of pages and widen the scope of the magazine. This would fulfill the obligation to PARK EAST's present subscribers and would fulfill Internal Revenue's requirements about publishing a magazine. We could have an agreement with PROMENADE that whatever amount we paid them could be used in any way they thought best to satisfy the present PARK EAST subscribers, to help them get advertising in the PARK EAST edition of PROMENADE, and to make that edition a magazine that might have continuing acceptance with subscribers and that eventually, after all unexpired subscriptions had been filled, could be put on newsstands if PROMENADE chose to get circulation that way. Or if PROMENADE chose to try to get newsstand circulation for its PARK EAST edition right from the beginning, it could do so as far as we were concerned, but only with its own money and not by using any of ours. We would stipulate that our money could be used only for additional editorial and production personnel, additional editorial material, and the paper, production, and mailing costs of whatever copies were needed to fulfill the unexpired subscriptions.

If all circulation were on subscription, there would be the advantage from an advertising standpoint that a PROMENADE salesman could tell the prospect just what the circulation was in terms of geography at least, and as long as this circulation was not costing PROMENADE anything, it could be added to their present circulation as a bonus to their present advertisers and as an inducement to new ones, if it could not be sold. If the PROMENADE people have enough faith in their own ability to publish a successful subscription and newsstand version of their present magazine if given financial help and a ready-made list of 20,000 or more readers who have shown themselves to be interested in that kind of magazine, we would provide the money and other inducements. If they were receptive to this, we might be able to make some arrangement with them to participate in the profit if the venture succeeded.

I favor this last way of doing it for these reasons:

(1) FAMILY CIRCLE would not have to appear at all as publisher of any other magazine.

(2) Our money cost would be as small as it could be and would be known at the beginning, with no chance of our getting involved beyond our first expectation because of something that looked encouraging and led us to further investment and then went bad.

(3) We would not need to spend any of our own time here or at PROMENADE's office and would not need to involve any of our own people or facilities. The responsibility would not be divided, and it would be known from the beginning whose responsibility everything was.

(4) From PROMENADE's standpoint the venture could be as limited or as unlimited as they wanted to make it, and they would have complete control, once certain requirements were fulfilled. I would think that on this basis it would seem like a windfall to them and they could hardly afford to refuse it, whereas on any of the other bases, I can think of a good many objections they might have.

We would forego the possibility of making a profit out of another publishing venture, for the sake of getting for our stockholders a sure profit from a tax loss with the minimum amount of the sure profit known from the start.

On June 26, 1953, the directors of Family Circle voted to consolidate Family Circle into Park Magazine pursuant to Delaware and New York laws. Counsel for Family Circle had advised its directors that the loss carryover would be allowed to petitioner following the consolidation if it continued publication of Park East. It was accordingly decided to continue the publication of a magazine which it was thought would satisfy the tax law requirements and thereby assure Family Circle the carryover of Park Magazine's net operating loss which was in excess of $740,000.

On June 26, 1953, Lilienthal canceled the indebtedness owed to him by Park Magazine and represented by notes aggregating $782,000 plus accrued interest of $57,705.22. This eliminated a deficit and created a capital surplus of $782,000 on the books of Park Magazine. He also delivered to Family Circle a document warranting against undisclosed liabilities of Park Magazine, indemnifying Family Circle and its successors against any such liabilities, and agreeing to deposit with the consolidated corporation, as security for the indemnity, 250 shares

of the preferred stock of the consolidated corporation to be held for a period of 2 years thereafter.

On or about June 26, 1953, Leberman, Carl J. Schaefer, and Richard K. Sanderson who were directors and, respectively, president, vice president, and secretary of Family Circle became officers and directors of petitioner.

On June 30, 1953, a "CERTIFICATE OF CONSOLIDATION OF PARK MAGAZINE, INC. and THE FAMILY CIRCLE, INC., into PARK MAGAZINE, INC. (under the name of THE FAMILY CIRCLE, INC.)" was filed with the Department of State of the State of New York pursuant to section 91 of the stock corporation law of New York. The corporation surviving the merger is now the petitioner. Petitioner's authorized capital was increased from 100-no-par shares to $300,000 represented by 2,000 shares of $100-par-value preferred stock and 100,000 shares of $1-par-value common stock, the holders of the preferred stock being entitled to receive cash dividends cumulatively at 6 percent per annum. On June 30, 1953, an "AGREEMENT OF CONSOLIDATION AND MERGER between PARK MAGAZINE, INC., and the Directors thereof and THE FAMILY CIRCLE, INC., and the Directors thereof" was filed with the secretary of state of Delaware and recorded with the recorder of deeds for Kent County, Delaware.

Pursuant to the aforesaid certificate and agreement, the 87,804 shares of common stock of Family Circle, the Delaware corporation, were changed, converted into, and exchanged for an equivalent number of shares of $1-par-value common stock of the consolidated corporation, designated the Family Circle, Inc., a New York corporation. The 100 shares of Park Magazine's no-par-value common stock were changed, converted into, and exchanged for 1,500 shares of $100-par-value 6 percent preferred stock of the consolidated corporation, designated the Family Circle, Inc., a New York corporation.

Since it was believed that Family Circle could only obtain the benefit of Park Magazine's net operating losses if it published a magazine which could be considered a continuation of the former Park East publication, Endicott suggested that Promenade, Inc., be hired to publish the magazine. On July 1, 1953, a proposal was addressed to Promenade, Inc., which was accepted, as follows:

As a result of the consolidation of The Family Circle, Inc., into our Company, we are now in a position to continue the publication of Park East Magazine. We accordingly make the following proposal to you which, if accepted by you in the place indicated below, will constitute a contract between us:

1. We propose that the magazine "Park East" will be published in a slightly different form under the "Park East" name. The masthead of this magazine will be as set forth in the appendix to this agreement.

2. You are hereby appointed and will act as Editorial Director and Advertising Representative of this magazine and in so acting you will purchase or otherwise acquire all necessary editorial matter, including stories, articles, photo-

graphs, cuts, cartoons, art work and other features, such editorial matter to be selected by you subject only to our reasonable review. We will pay for that portion of the editorial matter appearing in this magazine that exceeds the amount of editorial matter that has hitherto been supplied to the Promenade Magazines, such as the "Waldorf-Astoria" and others, that you edited in the past and will continue to edit.

3. In acting as our Advertising Representative, you will solicit advertisements for this magazine at such schedule of rates as we shall promulgate as hereinafter provided, it being understood that you may offer advertisers in your Promenade Magazines advertisements without further cost to them in the October, November, December and January issues of "Park East."

4. For your services in so acting as Editorial Director and Advertising Representative, we will pay to you monthly in advance the sum of $2,500 beginning with the month of July, 1953 through the month of January, 1954, and if this agreement is not then terminated, thereafter monthly so long as this agreement shall remain in full force and effect. We agree to reimburse you upon demand for the actual cost of all editorial matter that you may purchase for the account of this magazine and for any other disbursements that you may incur for our account as publishers of this magazine, it being understood that you are not to expend more than a maximum of $5,000 per issue on such editorial matter without our written consent first had.

5. We agree to collaborate with you and to make available the services of our Promotional Department in the development and promotion of advertising for this magazine and, as well, the Promenade Magazines, it being agreed that the actual costs of such promotion, including the cost of supplying the services of our Promotional Department, will be divided among us monthly on the basis of the circulation of the Promenade Magazines and this magazine for the then current issue, settlement to be made within ten (10) days after such circulation is determined.

6. The circulation of this magazine will be handled entirely by us, either directly or through agents of our own choosing. The printing of this magazine will be, until otherwise agreed, conducted by your present printers at Orange, Connecticut, it being understood that we will pay the cost of printing the 16-page form to be added to the editorial content of the Promenade Magazines in order to make up the content of this magazine and will, in addition, pay for the printing of all the copies of this magazine at the printing rate currently charged by your printer for the thousands of copies in excess of the circulation from time to time of the Promenade Magazines. Such printing costs will include the cost of paper for which we will pay our prorata share based on the total cost for the total circulation of the Promenade Magazines and this magazine.

7. The arrangement herein contemplated shall continue for the publication of "Park East" for the following issues: October, November, December, 1953, and January, February and March, 1954, and shall thereafter continue indefinitely unless terminated by either party by notice in writing to the other given at least ninety (90) days prior to the publication date of the termination issue; provided, however, that either party shall have the right to cancel and terminate this arrangement, effective upon the completion of the publication of the March 1954 issue, by notifying the other in writing accordingly not later than January 31, 1954. In the event of any such termination effective upon the completion of the March 1954 issue, we shall relinquish and release any right to the use of the name "Promenade" and shall not in any way advertise or publicize that we have any right to use said name or have any association whatsoever with you, and we shall be free to publish a magazine of the form and

content of "Park East" in any manner that we desire, and you may continue to publish "Promenade Magazines" or any other magazines in the form and content of "Park East" (without using the title "Park East") in such form and content as you may determine. In the event such notice is given on or prior to January 31, 1954, your compensation at the rate of $2,500 per month shall cease with the payment on January 1, 1954.

On September 2, 1953, List Maintenance Corporation, an independent "fulfillment" organization (which had professionally maintained subscription files, stencils, etc., and rendered reports on total subscriptions mailed) was appointed exclusive agent to handle subscription fulfillments and mailings on Park East subscriptions. The agreement with List Maintenance Corporation provided in part:

It is a material term of this agreement that twelve (12) consecutive issues will be published during each year of this contract and the price agreed upon in Paragraph EIGHTH herein contemplates such performance on the part of Park East for at least a one (1) year period, viz, (12 consecutive monthly issues), but nevertheless, it is understood and agreed that should Park East, for any reason whatsoever, fail to publish at least six (6) consecutive issues starting with October, 1953, then the price fixed herein shall be adjusted to the amount of $.03247 instead of $.0283 per copy addressed; but should Park East, for any reason whatsoever, fail to publish less than twelve (12) consecutive monthly issues starting with said October, 1953 but more than six (6) issues, then the price fixed herein shall be adjusted to the amount of $.03038 instead of $.0283 per copy addressed; in any such event, a revised bill in the increased amount shall be sent to Park East for any and all services rendered hereunder, and upon payment thereof, this agreement shall cease, terminate and come to an end without further liability on the part of Park East, notwithstanding anything to the contrary herein provided.

Following the July 1, 1953, agreement with Promenade, Inc., Leberman devoted part of his time to the continuation of Park East. Charles C. Sibre (hereinafter sometimes referred to as Sibre), who was business manager of Family Circle, took charge of finance and circulation matters, and negotiations with the post office and A.B.C. and other general business matters. One premerger employee of Park Magazine remained to work on circulation matters and two additional employees were engaged to handle promotional advertising for Park East and Promenade. By agreement with the lessor, the lease for offices maintained by Park Magazine prior to the merger was canceled and the corporate records were moved to the Family Circle publishing offices at 25 West 45th Street, New York.

On October 30, 1953, the directors of petitioner reviewed the results of the Park East October issue including a report from Sibre outlining in detail the results of newsstand sales checks of the issue both in Metropolitan New York and other cities and locations throughout the United States, promotional efforts made to secure new subscriptions and subscription renewals, advertising and promotional efforts for Park East by the Promenade, Inc.'s staff, and probable advertising income based on the October and November issues at rates and distri-

butions to become effective with the February 1954 issue. After the sales results of the October issue were known, Johnston wrote a memorandum to Leberman on November 5, 1953, which read in part as follows:

*National advertisers*—There's a tendency on the part of national advertisers to wait and see what our policy will be as far as Park East is concerned—where it is being distributed—how it is received—will Family Circle really make a sustained effort to put Park East over or will it be dropped after a short run of several months? Someone on the Family Circle staff has made the remark (which I got second-hand) that Family Circle will drop Park East like a hot potato if it doesn't go over well in the first six months. If such a statement is getting around, it is just too bad because national advertisers certainly are loathe to support a magazine they think will not last. With national advertisers we got off to a slow start because of the cumbersome name "Promenade-Park East" and the necessity of thoroughly explaining just what the relationship is between the two magazines. We have also been hampered by the fact that we have not, as yet, had enough information about the distribution of the October issue which, I hope, will be coming along shortly.

       *         *         *         *         *         *         *

However, unless we can get some financial help, Promenade can easily fail. Family Circle, on the other hand, can come out very profitably because of the tax loss. Before attempting to raise any money in Promenade's behalf, I would want some assurance that the arrangement is continuous in the foreseeable future and that Promenade has a chance of making a profit comparable with other years during the formative months. I think, therefore, we need:

1. Financial help such as working capital to get over the next few months, or
2. An increase in the publication fee.
3. A strong statement from Family Circle that they are behind this venture and will not drop out summarily in the next few months.

On December 17, 1953, petitioner's directors considered the results of the issues of Park East published since the merger, including subscription, newsstand, and advertising income, the report showing newsstand sales of only 30 percent of newsstand distributions and anticipated total income of only $10,650 per issue for the forthcoming February and March issues. Leberman's report prepared several days previously from petitioner's books of account and other sources showed Park East expenditures of $92,908 to December 15, 1953, and estimated the cost of publishing the February and March issues at $42,800. Leberman further told the directors that while an October survey of newsstands originally indicated a 55 percent newsstand sale, final returns showed only a 29 percent sale and he estimated that returns of unsold November and December issues would be as high or higher; that subscription renewal or new subscription appeals to the 46,000 current or former subscribers to Park East had brought in 6.6 percent new or extended subscriptions and that after publication of the October issue, a further appeal to an additional 7,600 names brought only 1.2 percent new subscriptions. He said he had reached the conclusion that to continue publishing Park East would un-

doubtedly result in substantial additional losses since it was impossible to meet the Audit Bureau of Circulations' guarantee of 50,000 circulation. The results of the last four issues clearly indicated such a lack of public acceptance that continuation of Park East would not be justified. The directors then adopted the following resolution:

RESOLVED, that this Corporation cease publication of the magazine "Park East" at the earliest possible opportunity, and that the President or any Vice-President be and he hereby is authorized and directed to negotiate a termination of the existing contracts of this Corporation with its distribution agency and its editorial adviser and advertising representative on such terms as the officer negotiating the same may approve to the end that the losses of the Corporation in the publication of such magazine may be stopped at the earliest possible moment;

On December 28, 1953, petitioner agreed with Promenade, Inc., upon termination of the July 1, 1953, agreement in consideration of payment of $10,000 to Promenade, Inc., and reimbursement of up to $7,500 for editorial costs incurred by Promenade, Inc., for the February and March issues originally contemplated to be published in January and February 1954. Johnston was happy to terminate Promenade, Inc.'s arrangement. Promenade advertisers had not responded to the free extra circulation and advertising they received in Park East; their objection was that they could reach Park East's customers just as well through newspaper advertising whereas they could not reach the hotels' transient guests except through Promenade. Thus, Johnston felt that the advertisers would not pay the increased advertising rate (from $700 to $900 per page) which was to become effective with the February issue of Park East.

In February 1954 petitioner transferred its subscription list to Travel Magazine in consideration of the latter's assumption of petitioner's unfulfilled subscription liabilities to subscribers, which then totaled $28,932.93. At the time of the merger petitioner had a liability to subscribers of $31,867.84 for unearned subscriptions. The transfer of the unfilled subscriptions to Travel Magazine resulted in no cash income to petitioner; however, petitioner recognized the transfer of such liability as income for tax purposes.

On June 7, 1954, petitioner redeemed 1,400 shares of its preferred stock by payment of $140,000 cash to Lilienthal, the holder thereof, having previously (in November 1953) redeemed 100 shares of preferred stock by payment of the par value thereof to Lilienthal. During the taxable year ended March 31, 1954, petitioner paid Lilienthal $6,578.33 as dividends on his preferred stock.

Petitioner's postmerger cash income from Park East totaled $24,754.85 comprised of subscriptions $16,754.39 (of which $10,526 represented collections of postmerger subscriptions) and $8,000.46 representing net income from newsstand sales. Following the mer-

ger, petitioner expended $152,921.99 in publishing Park East, as follows:

| | | | |
|---|---|---|---|
| Paper | $24,885.96 | Advertising | $4,499.24 |
| Printing and other produc- | | Circulation | 26,242.48 |
| tion costs | 33,596.71 | General and administra- | |
| Editorial | 54,829.27 | tion | 8,868.33 |

Sometime during the last months of 1954, C. E. Merrill (hereinafter referred to as Merrill), who, as trustee, was petitioner's principal stockholder, decided to dispose of his holdings in Family Circle to the employees who were responsible for building up The Family Circle magazine; and in December 1954 petitioner's assets were sold to Chain Magazines, Inc. (hereinafter referred to as Chain Magazines), a corporation formed for such purpose by Leberman, Carl J. Schaefer, and several other employees of petitioner. Thereupon, petitioner changed its name to F. C. Publication Liquidating Corporation. Chain Magazines then assumed the name The Family Circle, Inc., and continued publication of The Family Circle Magazine.

Distribution of the proceeds of sale of petitioner's assets was completed on June 7, 1955, and petitioner's gains on said sales were accorded nonrecognition under section 337 of the Code. Petitioner's unused net operating loss deduction upon completion of liquidation, as set forth in its final tax return, was $361,232.54.

Family Circle, a corporation, acquired control of Park Magazine after October 8, 1940, for the principal purpose of evading or avoiding Federal income and excess profits taxes by securing the benefit of a deduction and a credit which it would not otherwise have enjoyed.

### OPINION.

In the notice of deficiency, respondent determined that the petitioner was not entitled to carryover net operating losses incurred in the fiscal years 1950, 1951, and 1952 to the fiscal years ended March 31, 1954,[1] March 31, 1955,[2] and June 7, 1955.[3] It was also determined that petitioner was not entitled to carry over unused excess profits tax credits.[4] Subsequently, at the trial, respondent contended that the

---

[1] Your claimed net operating loss deduction of $721,127.89 has been disallowed inasmuch as it has not been established by you as allowable under section 122, or any other section, of the Internal Revenue Code of 1939.

[2] Your claimed net operating loss deduction of $434,394.54 has been disallowed inasmuch as it has not been established by you as allowable under section 172, or any other section of the Internal Revenue Code of 1954.

[3] Your claimed net operating loss deduction of $365,801.09 has been disallowed inasmuch as it has not been established by you as allowable under section 172, or any other section of the Internal Revenue Code of 1954.

[4] Your excess profits credit has been determined to be $129,384.52, based on invested capital. No unused excess profits credit carryover has been allowed inasmuch as you have not established that an unused excess profits credit carryover is allowable to you under any of the sections of the Internal Revenue Code of 1939.

loss carryovers should be disallowed because the stock of petitioner was acquired for the interdicted purposes set forth in section 129(a) of the Internal Revenue Code of 1939.[5] We need only consider the latter issue because it will dispose of the case before us.

The decision in this case rests on the factual issue of whether Family Circle acquired control of Park Magazine for the principal purpose of evading or avoiding Federal income taxes by securing a deduction which it would not otherwise have enjoyed. It is the contention of the petitioner that although the tax loss carryover was considered, it was not the principal purpose of the acquisition.

In order to prove that the principal purpose of the acquisition was not tax avoidance, petitioner seeks to establish that the principal purpose was of a business nature. Leberman testified that he recommended the merger of Park Magazine and Family Circle because he felt that it was a good opportunity to get into a new magazine which could produce a lot of revenue.

Prior to the merger Park Magazine had terminated most of its contracts and dismissed most of its employees, so that at the time of the merger Park Magazine was basically an insolvent shell. Its balance sheet showed assets of only $12,965.70. Of course, the asset value of the name Park East, the subscription lists, and the loss carryover were not included in that total. Leberman testified Family Circle wanted all these assets. Certainly the loss carryover had a value, but the value of the name and subscription list of a defunct magazine was entirely conjectural.

There was at least a colorable attempt to publish the magazine Park East. It is true that approximately $100,000 was spent for that purpose, but an additional expenditure or loss had been expected [6] if the loss carryover was to be taken advantage of.

Family Circle was a corporation which had premerger assets of approximately $3 million. For the 7 months prior to the merger, Family Circle had made a profit of $443,079.58. The record does not support the contention that Family Circle, a highly successful publisher, merged with Park Magazine principally as a business venture for the principal purpose of pumping new life into a then-insolvent

---

[5] SEC. 129. ACQUISITIONS MADE TO EVADE OR AVOID INCOME OR EXCESS PROFITS TAX.

(a) DISALLOWANCE OF DEDUCTION, CREDIT, OR ALLOWANCE.—If (1) any person or persons acquire, on or after October 8, 1940, directly or indirectly, control of a corporation, * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income or excess profits tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. * * * [So far as here applicable, sec. 269 of the 1954 Code contains no substantial change.]

[6] Direct examination of Palmer K. Leberman.

"Q. Did you make any private estimates of your own regarding potention [sic] profits from Park East?

A. I did it more on the down side for my own private estimate to be sure we weren't going to lose too much money."

corporation. Park Magazine was a known financial failure. Promenade, Inc., a company with no experience in the sale of newsstand publications, was to publish Park East. Leberman and Sibre were the only two employees of Family Circle that worked with the publication of Park East. Thus, Family Circle made little effort to devote the wealth of experience of its own organization in the venture. Moreover, Family Circle did not enter into a single contract regarding Park East which could not be terminated within 6 months. Apparently Promenade, Inc., surmised Family Circle's true intentions shortly after it began publishing Park East as indicated by Johnston's comments in his memorandum to Leberman, dated November 5, 1953, set forth in our findings. Even Leberman, petitioner's own witness, testified that the tax loss was an important consideration in the merger.[7]

Endicott, the editor and a director of Family Circle at the time of the merger, testified that he was present at the directors meeting when the merger was discussed. According to his testimony, the decision reached at that meeting was to take over a tax loss and to publish a magazine that could be considered a continuation of Park East. It was Endicott's suggestion that Promenade, Inc., publish Park East. The reason he suggested the publication was because it was his understanding that this was the legal requirement for taking advantage of the tax loss. On cross-examination Endicott testified as follows:

Q. What is the basis of your reference to legal requirements? Upon what statement is that based?
A. Through others in the company. Through others in the company they discussed the whole subject with me.
Q. When you voted in favor of the transaction at the June 26 meeting, you had certain things in mind, did you not?

\*　　\*　　\*　　\*　　\*　　\*　　\*

A. Well, I was voting for what I considered to be the best interests of the company.
Q. Exactly, that was what?
A. To buy the tax loss.

\*　　\*　　\*　　\*　　\*　　\*　　\*

A. I voted for the transaction on the basis that the company would make a profit out of the following the plan that been—that had been proposed. [sic]
Q. Which was to publish the magazine and to use the tax loss carry-over?
A. That is right. Both points.
Q. They were both linked together, in your mind, is that correct?

---

[7] "Q. What part did the tax loss-carry-over have in your recommendation to the Director? A. I honestly say we wouldn't have paid Mr. Lilienthal as much as we did if it had not been—we wanted all the assets of the corporation. After all, it was one of their assets and we wanted that along with the publishing venture.
Q. In what sense was it an asset?
A. If we went into the publishing of Park East, we were very sure to lose some money and certainly the tax carry-forward as an asset if we would—if we could make any money, continue to make money on Family Circle, it would be an asset."

A. One was a requirement of the officers—a requirement of the other, as I understood.

It was also Endicott's testimony that as a businessman he had no expectation that the publication of Park East would be a profitable operation. However, he also testified that there was a possibility of making a profit out of the venture if an unlimited amount of money were put into it. When asked on cross-examination how much he thought would be invested, he answered as follows:

A. Well, I go back to my previous testimony, I thought that enough was going to be invested to satisfy whatever legal requirement was necessary to benefit tax loss and then if it had turned into a profitable venture, it would have been continued.

Other evidence that Family Circle only intended to put a limited amount of money into the publication of Park East is found in a memorandum from Leberman to Clarissa deVellers in which he says:

I think you will recall that we decided to put $5,000 per month editorially into the sixteen pages to make the magazine something that people would want to buy. Frankly, if we have to spend another $5,000 a month to promote the sale, it just won't be a profitable business venture.

We think that the following excerpts from Endicott's memorandum to Leberman, dated June 11, 1953, adequately describe the true intentions of Family Circle:

We would not need to spend any of our own time here or at PROMENADE's office and would not need to involve any of our own people or facilities. The responsibility would not be divided, and it would be known from the beginning whose responsibility everything was.

*　　　*　　　*　　　*　　　*　　　*　　　*

We would forego the possibility of making a profit out of another publishing venture, for the sake of getting for our stockholders a sure profit from a tax loss with the minimum amount of the sure profit known from the start.

On the basis of all the evidence, we have found as a fact that Family Circle acquired control of Park Magazine for the principal purpose of evading or avoiding Federal income taxes by securing the benefit of a deduction which it would otherwise not have enjoyed. Having so found, section 129 of the 1939 Code requires the disallowance of the net operating loss carryover.

Likewise, respondent's disallowance of petitioner's excess profits tax credit is sustained. The respondent's determination is presumptively correct, and petitioner has introduced no evidence to overcome this presumption. Furthermore, in view of our finding of fact that the principal purpose for the acquisition of control of Park Magazine, Inc., was tax avoidance, the determination is sustained on the same basis.

*Decision will be entered for the respondent.*