C. Clinton **CARPENTER** and Phyllis S. Carpenter, Petitioners-Appellants,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 13124.

United States Court of Appeals Fourth Circuit.

Argued June 12, 1969.

Decided Sept. 16, 1969.

Richard B. Spindle, III, Norfolk, Va., for petitioners.

Issie L. Jenkins, Atty., Department of Justice (Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson and Elmer J. Kelsey, Attys., Department of Justice, on the brief), for respondent.

Before BOREMAN, BRYAN and BUTZNER, Circuit Judges.

PER CURIAM:

The Carpenters appeal from a decision of the Tax Court upholding an assessment against them by the Commissioner of Internal Revenue of an income tax deficiency for the taxable year 1957 in the amount of $39,687.41.

The facts, some of which were stipulated, were found and stated in the Tax Court's opinion substantially as follows:[1]

Mr. Carpenter was engaged in the construction business from 1920. Prior to and during the taxable year 1957 he was engaged in the heavy construction business as a sole proprietor, trading under the name of Carpenter Construction Company. He also owned all the outstanding stock of Chesapeake Manor, Inc. (hereinafter referred to as "Manor"), a corporation which since 1951 had been successfully operating a rental housing project which it owned. Mr. Carpenter also owned all the outstanding stock of Chesapeake Housing, Inc. (hereinafter referred to as "Housing"), a corporation engaged in the business of developing land and building houses for sale.

In accordance with a debenture agreement dated August 15, 1953, First Mortgage Corporation (hereinafter referred to as "First Mortgage") sold debentures of Housing in the total amount of $82,500. First Mortgage insisted upon collateral to secure such debentures. Accordingly, on August 15, 1953, the Carpenters entered into an agreement with First Mortgage for the benefit of holders of the debentures, in which the Carpenters agreed to purchase the debentures at maturity at face amount, plus accrued and unpaid interest, "provided, however, that first parties [the Carpenters] may, at their election, cause Chesapeake Housing, Inc., to discharge said debentures according to their tenor in lieu of purchasing" them. By the same agreement Mr. Carpenter, as collateral security for performance of the above obligation, delivered to First Mortgage all the common stock of Manor. It was also provided in the agreement that if Housing should not discharge the debentures and the Carpenters should not repurchase them, then First Mortgage, at the request of any of the holders of the debentures, could sell such collateral by public sale, free from any right of redemption on the part of the Carpenters.

The above debentures were subsequently retired and new debentures were issued under agreements substantially identical to the above agreements. On June 3, 1957, the face amount of Housing's outstanding debentures was $159,000. The net proceeds from the sale of all debentures had been delivered by First Mortgage to Housing.

By June 3, 1957, Housing was in default on the debentures, and on that date First Mortgage offered the stock of Manor for sale at public auction. At such public auction First Mortgage, as agent for the owners of the debentures, purchased the stock of Manor for $150,000. Thereupon First Mortgage immediately assigned and delivered Housing's debentures in the amount of $159,000 to Mr. Carpenter. Thereafter, First Mortgage made no further effort to collect any additional amount from Housing or the Carpenters to satisfy claims with respect to the debentures.

Mr. Carpenter's basis in the Manor stock sold by First Mortgage was $500.

At the time of the foreclosure sale Mr. Carpenter and his sole proprietorship, Carpenter Construction Company, were indebted to Housing in the total amount of $151,820, which debts were reflected on Housing's books as accounts

---

1. The statement of facts is incorporated herein to disclose the nature of the transactions involved which gave rise to the tax deficiency.

receivable. The consideration giving rise to the indebtedness was not shown. Housing's balance sheet at or about the date of foreclosure was as follows:

### ASSETS

| | | |
|---|---:|---:|
| Cash on Hand and In Banks | | $ 4,516.85 |
| Accounts Receivable | | |
|     Carpenter Construction Co. | $106,820.31 | |
|     C. C. Carpenter | 45,000.00 | |
|     Osceola Development Corp. | 62,700.00 | |
|         Total Accounts Receivable | | 214,520.31 |
| Land | | 5,325.00 |
|         Total Assets | | $224,362.16 |

### LIABILITIES

| | |
|---|---:|
| Debenture Bonds Payable | $159,000.00 |
| Capital Stock | 10,000.00 |
| Net Worth | 55,362.16 |
|         Total Liabilities and Net Worth | $224,362.16 |

———◆———

Phyllis Carpenter was not liable on any of the debts owing to Housing.

On May 31, 1957, the balance sheet of Mr. Carpenter's sole proprietorship, Carpenter Construction Company, showed total assets of $268,354.22, total liabilities of $255,431.01, and a resulting net worth of $12,923.21. Mr. Carpenter had no assets other than those shown in the balance sheet of Carpenter Construction Company, except his home which was owned by him and his wife jointly. Included in the assets of Carpenter Construction Company at book value were an account receivable from, and a 40 percent stock investment in Osceola Development Corporation in the respective amounts of $11,285.63 and $45,000, and a stock investment in Housing in the amount of $10,000.

Osceola Development Corporation had been formed prior to 1953 for the purpose of acquiring 600 acres of land in Florida and constructing a housing development thereon. In 1953, following the issuance of debentures by Housing, Osceola Development Corporation made preliminary presentations to the Federal Housing Administration which made tentative commitments to Osceola. Osceola proceeded to spend money for development. However, in 1954 FHA refused a formal commitment. Accordingly, Osceola could not obtain the necessary financing for the development as planned, but nevertheless continued the development insofar as it was able to do so.

In the notice of deficiency the Government increased the Carpenters' reported income from capital gains by $79,250, stating as follows:

It is held that you realized a gain in the amount of $158,500.00 on the sale of capital stock of Chesapeake Manor Corporation on June 3, 1957. The gain has been computed as follows:

| | |
|---|---:|
| Consideration received | $159,000.00 |
| Basis of stock surrendered | 500.00 |
| Gain realized | $158,500.00 |
| Taxable at 50% (long-term) | $ 79,250.00 |

We affirm the holding of the Tax Court for the reasons stated in its opinion.[2]

Affirmed.

2. C. Clinton Carpenter and Phyllis S. Carpenter, T.C.Memo 1968–157, ¶ 68,157 P–H Memo T.C. (1968).