*Decisions will be entered under Rule 155.*

CANAVERAL INTERNATIONAL CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2576–69.    Filed January 29, 1974.

*Carl F. Bauersfeld, Robert J. Tyrrell,* and *Robert Ash,* for the petitioner.

*Marlene Gross,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax and that of its affiliated companies for the taxable year ended September 30, 1966, in the amount of $159,431.48. By stipulation the parties have settled most of the issues outlined in the notice of deficiency, leaving for decision the following questions:

(1) Whether the principal purpose motivating petitioner's acquisition of the stock of Norango, Inc., was the evasion or avoidance of Federal income tax within the meaning of section 269;[1]

(2) What is the adjusted basis under section 1011 for computing the allowance for depreciation and gain or loss with respect to a yacht owned and later sold by Sea Research, Inc., one of the affiliated corporations joining in petitioner's consolidated return for its fiscal year ended September 30, 1964?

(3) Whether the intercompany accounts payable owed by Bimini Run, Ltd., to Canaveral Groves, Inc., and Able Engineering Co., Inc., became worthless within the meaning of section 166(a) in the taxable year ended September 30, 1966; and

(4) Whether and to what extent Canaveral Groves, Inc., incurred business expenses deductible under section 162(a) in taxable years

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.

ended September 30 of 1963 and 1964, for space and transportation supplied by Bimini Run, Ltd.

### *General*

Canaveral International Corp. (hereinafter petitioner) was incorporated in 1960 under the laws of Delaware. Its principal office at the time of filing the petition in this proceeding was in Miami, Fla. For the taxable years ended September 30 of 1960 through 1967, petitioner and its domestic subsidiary corporations filed consolidated income tax returns on the accrual basis with the district director of internal revenue, Jacksonville, Fla.

Petitioner is a public corporation whose shares are traded on the American Stock Exchange. Petitioner holds the stock of numerous subsidiaries which are engaged primarily in land development and shipping businesses. At all times pertinent to this proceeding, Henry Dubbin was chairman of the board and vice president of petitioner, and Daniel S. Dubbin, Henry's brother, was president. The Dubbins were the original promoters of petitioner and, with their wives, were the largest single shareholders of the company. Since the company's inception, both men have devoted their full time and efforts to the management of petitioner and its subsidiaries.

### 1. *Acquisition of Norango, Inc.*

Norango, Inc. (hereinafter Norango), was a Maine corporation whose principal tangible asset on July 16, 1962, was a yacht, the M/Y Norango (hereinafter sometimes "the yacht" or "the vessel"). The M/Y Norango was constructed in 1959 with a North Sea trawler hull according to the specifications of Norman B. Woolworth (Woolworth), to be used for Woolworth's personal pleasure. Ownership of the yacht was placed in Norango in October 1959 to protect Woolworth from liability connected with the use of the vessel. All the funds necessary to purchase and maintain the yacht were contributed or advanced by Woolworth, and he was the beneficial owner of all of Norango's stock.

Shortly after Norango acquired the yacht, Woolworth became terminally ill. Since Woolworth's wife disliked the yacht and it was expensive to maintain, the M/Y Norango was decomissioned. While owned by Norango, the vessel was used only two or three times by the Woolworth family, and it was never used for business purposes.

During the period of his illness, Woolworth had advertised the yacht for sale through his attorney, Talbot M. Malcolm (Malcolm). Except for the negotiations described below, Malcolm received no offers to purchase the vessel.

In March or April 1962, Alex M. Balfe (Balfe), a shipbroker in Miami, Fla., learned that the M/Y Norango was for sale and so advised Henry Dubbin. Henry Dubbin had told Balfe petitioner was interested in buying a vessel suitable for oceanographic and geodetic work because one of its subsidiaries previously had owned a ship chartered for oceanographic work and such charter had been very remunerative to petitioner. Due to her trawler hull, spacious decks, seaworthiness, and more-than-adequate accommodations, the M/Y Norango was suitable for petitioner's purposes.

Balfe and Henry Dubbin telephoned Woolworth, who was then in the hospital, and discussed the possibilities of acquiring the vessel. Henry Dubbin suggested that the vessel be acquired in exchange for petitioner's stock. After discussion, Woolworth requested financial statements and other details concerning petitioner which were forwarded to him.

Woolworth died on June 19, 1962, before the transaction for acquisition of the vessel was completed. After his death, Henry Dubbin received a call from Malcolm, as attorney for the executors of Woolworth's estate (the estate), who expressed a desire to continue the negotiations for the sale of the yacht. Henry Dubbin then traveled to New York in order to meet with Malcolm and consummate the transaction.

Sometime prior to reaching an agreement as to the terms of the sale of the M/Y Norango, petitioner's attorneys discovered that the vessel was owned directly by Norango rather than by Woolworth. When petitioner's accountants reviewed Norango's books and records, they noted that the books showed $961,484.89 in notes payable to Woolworth. Norango's balance sheet also showed that the vessel's basis, inclusive of furnishings, was $769,632.75. Petitioner's representatives then asked Malcolm to sell the stock of Norango rather than the vessel itself. In order to liquidate the debt, petitioner negotiated to purchase the notes along with Norango's stock. Later, petitioner contributed the notes to Norango's capital surplus.

Petitioner ordinarily receives tax and legal advice from Miami-based accountants and attorneys. However, in negotiating for the purchase of Norango, petitioner retained Ernest Field as counsel in New York. Field, who is both an attorney and an accountant, discussed the tax implications of the Norango acquisition with petitioner's comptroller and auditing division.

On July 16, 1962, the executors of Woolworth's estate signed a written agreement to sell all the issued and outstanding stock of Norango (1,500 shares), plus the aforementioned notes in the amount of $961,484.89, to petitioner in exchange for 949 shares of petitioner's preferred non-dividend-bearing, nonvoting, convertible stock. Under

the terms of the agreement, (1) the preferred stock had to be converted into 20,878 shares of common stock on or after February 1, 1966, and before February 1, 1967,[2] or (2) in the event petitioner proposed to redeem the preferred stock, the estate could convert it as in (1). Petitioner had the option to redeem all or a part of the common stock at agreed-upon redemption prices, the lowest price being $12.65 per share if the common stock were redeemed prior to July 16, 1963, and the highest price being $15.52 per share if the stock were redeemed prior to July 16, 1967. The closing of the sale occurred on August 17, 1962, and on that day, petitioner's common stock sold on the American Stock Exchange at a high of $11\frac{1}{4}$ and a low of $10\frac{3}{4}$. The fair market value of the yacht and of the 949 shares of petitioner's preferred stock on the date of the exchange was $177,500.

Shortly after the transaction was closed, the yacht was delivered to petitioner. On or about September 14, 1962, petitioner changed the name of the corporation, Norango, Inc., to Sea Research, Inc. (Sea Research), and the name of the vessel, M/Y Norango, to M/S Sea Search (hereinafter sometimes Sea Search). The names were changed in order to reflect the intended use of the vessel in oceanographic research. Also, additional work was performed to ready the vessel for charter. Lifesaving equipment, generators, and certain oceanographic and marine equipment were purchased and installed at a cost of $34,425.64.

At the time the Norango stock was acquired, petitioner had hired a public relations firm which, among other things, prepared and released publicity materials to various news media regarding petitioner's enterprises. The information used to make up the release quoted below, which was published on October 12, 1962, in the Miami Herald, was obtained from petitioner and reviewed and approved by Daniel Dubbin. The release was as follows:

Canaveral International President Daniel S. Dubbin Thursday announced the purchase of the 152 foot "Sea Search" from the estate of the late Norman B. Woolworth. The ship, built in 1959 for $1 million, was acquired through the exchange of 949 shares of preferred stock convertible after 1967 into 20,878 shares of Canaveral International Common. Current value of the equivalent common shares is $177,500. The company plans to lease the super yacht for oceanographic research and marine exploration.

The Sea Search was offered for charter in various marine and boating periodicals. Form letters were drafted and sent to various prospective users, together with brochures depicting both the exterior and interior of the vessel and its specifications. Despite extensive advertising ef-

---

[2] In a subsequent provision of the agreement, the estate agreed to waive its right to convert the preferred stock prior to Dec. 31, 1966.

forts, Sea Research was unsuccessful in chartering the vessel for oceanographic or geodetic work, so the ship was put to limited use as a day liner and in small private charters.

Because of the lack of response to its efforts to charter the yacht as planned and the high cost of maintaining it at dockside, Sea Research advertised the vessel for sale in February 1963 at a price of $550,000. Later, the asking price was decreased to $500,000. Finally, on October 17, 1963, Sea Research entered into an "Option Agreement for Sale and Purchase of Motor Vessel" with Tri-Continental Investments, Ltd. (Tri-Continental), a company unrelated to petitioner, for the sale of the yacht for $250,000 cash. A sale pursuant to such agreement was closed on December 10, 1963.

Prior to entering into the option agreement with Tri-Continental, an appraisal of the Sea Search was obtained from Balfe for purposes of either selling or mortgaging the vessel. Balfe stated in his September 27, 1963, appraisal that the current value of the vessel was $1,100,000 and that the replacement value was $1,500,000. By "current value," Balfe meant replacement cost less depreciation. Subsequent to entering into the option agreement with Tri-Continental, Daniel Dubbin secured from Balfe another appraisal of the Sea Search in order to substantiate to petitioner's shareholders the $250,000 sale price of the vessel. This appraisal stated that the fair market value of the Sea Search was $250,000.

Upon receipt of the latter appraisal, petitioner's accounting department recorded an entry in Sea Research's books as of the close of its September 30, 1963, fiscal year which debited capital surplus and created a valuation reserve in the amount of $501,771.65. The following explanation was entered in Sea Research's general journal: "To reduce value of M/V Seasearch [sic] based upon appraisal and to reflect value which management feels more realistically states asset value at time of acquisition."

After discussing the tax ramifications of the above entry with the certified public accounting firm which audits petitioner's records, petitioner reversed the entry, thus reinstating the former basis of the yacht as carried in Sea Research's books.

In Schedule D of petitioner's consolidated income tax return for the taxable year ended September 30, 1964, Sea Research claimed a section 1231 loss of $511,726 on the sale of "Motor Vessel, Equipment and Improvements" for $250,000. In computing the loss, petitioner used an adjusted cost basis of $761,726.28 which was computed as follows: The undepreciated basis of the yacht ($756,184.39) and furniture and fixtures ($13,448.36), as carried over from the books of Norango, was increased by the broker's commission paid to Balfe

($5,000) and other capital expenditures ($16,091.83), and reduced by the basis attributable to a motor launch which was sold ($3,000) and depreciation claimed after the vessel was converted to business use ($25,998.30).[3]

In the part of the notice of deficiency pertaining to the taxable year ended September 30, 1964, respondent determined that petitioner realized a gain of $74,855.71 rather than a loss of $511,726 on the sale of the yacht. Respondent computed a gain on the sale of the yacht by reducing by $592,132.75 the basis of the vessel (furniture and fixtures included) carried over from Norango's books, making a corresponding reduction in the depreciation claimed on the vessel. The adjustments were explained as follows:

It is determined that the reduction in basis of the yacht "Sea Search" is necessary to prevent the evasion or avoidance of income tax and to clearly reflect income. Section[s] 269 and 482 of the Internal Revenue Code.

It has not been established that the basis of the yacht "Sea Search" as used by you in your tax return was computed in accordance with Sections 1001, 1011 and 1012 of the Internal Revenue Code.

Respondent also determined that the depreciation deductions claimed on the yacht were overstated in the amounts of $4,071.73 and $4,971.94 for the taxable years ended September 30, 1962, and September 30, 1963, respectively, and understated in the amount of $3,492.56 in the taxable year ended September 30, 1964.

## 2. *The Intercompany Debts Owed by Bimini Run, Ltd., to Canaveral Groves, Inc., and Able Engineering Co., Inc.*

(a) *General background.*—Bimini Run, Ltd. (Bimini Run), is a Liberian corporation formed on November 16, 1961, to engage in the operation of a day liner between Miami, Fla., and certain ports in the Bahamas. Canaveral Groves, Inc. (Canaveral Groves), is a domestic corporation formed on May 27, 1959, to engage in the sale of land located in Brevard County, Fla. Able Engineering Co., Inc. (Able Engineering), is also a domestic corporation, formed on December 21, 1959, to engage in the construction of roads and canals and in the development of land. Bimini Run, Canaveral Groves, and Able Engineering are wholly owned subsidiaries of petitioner. For the taxable years pertinent herein, Canaveral Groves and Able Engineering joined in filing petitioner's consolidated income tax returns.

On December 6, 1961, petitioner, as owner of all the stock of a subsidiary, Atlantic Corp., which owned a ship then designated the

---

[3] Petitioner concedes on brief that the $5,000 commission to Balfe should not have been added to the basis of the M/Y Norango. Also, apparently some of the equipment installed on the vessel was removed at, or prior to, the time of the sale.

M/V Rustringen, sold such stock to Stephens Leasing Corp. The "Agreement of Sale" expressly provided that the M/V Rustringen would be, at the consummation of the agreement, under charter by Atlantic Corp. to Bimini Run. The terms and conditions of this charter were contained in a "Bareboat Charter" agreement of the same date, i.e., December 6, 1961, between Atlantic Corp. and Bimini Run.

The Bareboat Charter agreement of December 6, 1961, provided that the vessel would be known as the Calypso Liner and would be chartered to Bimini Run for a 60-month period at a charter hire of $6,000 per month. The monthly charter payments were payable to the Beverly Bank in Chicago, Ill., which held title to the vessel as security for a loan to Atlantic Corp. In a separate agreement also executed on December 6, petitioner guaranteed Bimini Run's performance under the terms of the Bareboat Charter agreement.

By an "Agreement for Charter of Vessel" dated May 27, 1962, Bimini Run agreed to subcharter the Calypso Liner to Rehavam Adiel and Harold Derber who were to form a Bahamian corporation for purposes of operating the vessel under the subcharter. Adiel and Derber formed two corporations: Bimini Run of Bahamas, Ltd., a Bahamian corporation which operated the Calypso Liner under the subcharter, and Bahamas Travel Corp., a Florida corporation which served as a domestic sales agency for tickets aboard the Calypso Liner. The May 27, 1962, agreement was a preliminary agreement which set forth the terms of the subcharter later incorporated into the actual "Bareboat Subcharter" agreement dated May 31, 1962.

The May 27 and May 31, 1962, subcharter agreements provided for the charter of the Calypso Liner by Bimini Run to Bimini Run of Bahamas, Ltd., for 10 years for a total charter hire of $1,600,000. To secure the performance of their obligations under the subcharter, Adiel and Derber arranged to have Universal Timber Corp., a Delaware corporation wholly owned by them, execute a $450,000 trust deed on approximately 100,000 acres of timberland in Marion County, Tenn. (hereinafter referred to as the Tennessee land), which gave Bimini Run or petitioner the right to foreclose on the land upon any default by Adiel and Derber, or their corporations, in the performance of the charter covenants.

Under the agreements of May 27 and May 31, 1962, Adiel and Derber were also required to pay Bimini Run approximately $125,000 for advance charter hire and equipment leases. In order to make this payment, Adiel and Derber, through Bahamas Travel Corp., borrowed $150,000 from Talco Capital Corp. (hereinafter Talco), a domestic corporation having its principal place of business in New York

City. Bahamas Travel Corp. executed a $200,000 promissory note, endorsed by Adiel and Derber, to Talco for this loan.

Under the agreements of May 27 and May 31, 1962, Talco received a participating but prior interest, to the extent of $150,000, in the trust deed on the Tennessee land. Talco was also given the right to call upon petitioner or Bimini Run in the event of default by Adiel and Derber, or their controlled corporations, on the promissory note to Talco or under the agreements of May 27 and May 31, 1962. By a separate agreement dated May 31, 1962, Talco, petitioner, and Bimini Run reaffirmed the provisions of the May 27, 1962, agreement regarding Talco's prior interest in the trust deed and Talco's right to call upon petitioner or Bimini Run for performance.

Bimini Run of Bahamas, Ltd., operated the Calypso Liner under the Bareboat Subcharter from June 1, 1962, through October 16, 1962. As a result of its failure to make the charter payments due on September 20 and October 1, 1962, a libel in rem action for possession of the Calypso Liner was filed by Bimini Run on October 16, 1962, which ultimately resulted in the return of the vessel to Bimini Run. Bimini Run began to operate the vessel between Bimini, the Bahamas, and Miami, Fla., in December 1962.

(b) *Bimini Run's account payable to Canaveral Groves.*—Shortly after the Calypso Liner was libeled by Bimini Run, Bahamas Travel Corp. and Bimini Run of Bahamas, Ltd., ceased operations and went out of business. The two corporations had no substantial assets after the ship was libeled. Nevertheless, Bimini Run accrued charter hire due from Bahamas Travel Corp. for October, November, and December 1962 which resulted in a $62,500 account receivable being carried on Bimini Run's books.

Bimini Run operated the Calypso Liner as a day liner between Bimini, the Bahamas, and Miami, Fla., in the taxable years ended September 30 of 1963 and 1964. In the taxable year ended September 30, 1964, Bimini Run also operated the Calypso Liner between Freeport, Grand Bahama, and Miami, Fla. In both fiscal years, Bimini Run obtained money to pay charter hire under its Bareboat Charter agreement and to operate and maintain the ship through cash advances from petitioner and Canaveral Groves. By June 30, 1963, Bimini Run's account payable to Canaveral Groves totaled $130,-301.26. By October 1, 1963, Bimini Run's account payable to petitioner totaled $185,861.95.

Petitioner and its subsidiaries are audited at least annually by an independent accounting firm. Adjusting journal entries are normally made by the auditors approximately 5 weeks or more after the close of the taxable year. By an adjusting journal entry dated September 30, 1963, the auditors decreased Bimini Run's $130,301.26 account pay-

able to Canaveral Groves by $66,500,[4] purportedly representing the transfer to Canaveral Groves of the Bahamas Travel Corp. receivable. The parties have agreed that at the time of the adjusting entry, the receivable was worthless.

By another adjusting journal entry dated September 30, 1963, the auditors further reduced Bimini Run's account payable to Canaveral Groves by the amount of $13,000 for sign rental and ticket expense charged to Canaveral Groves. This latter adjustment is the subject of part 3 of our Findings of Fact, discussed below. The $50,801.26 balance reflected in the loan payable account of Bimini Run as of October 1, 1963, has remained on the books and records of Bimini Run from that date until the time of trial.

(c) *Bimini Run's account payable to Able Engineering.*—In 1964 the Grand Bahama Port Authority, Ltd., agreed to acquire the Calypso Liner in exchange for 400 acres of undeveloped land in Freeport, Grand Bahama. Bimini Run was interested in the exchange since it had incurred losses from the charter and operation of the vessel in each of its fiscal years ended September 30 of 1962, 1963, and 1964.

In order to exchange the Calypso Liner for the land, Bimini Run was first required to obtain free and clear title to the vessel by paying off the Atlantic Corp.'s mortgage on the Calypso Liner held by the Beverly Bank in Chicago, Ill. For this purpose Bimini Run borrowed the amount of $158,134.25 from Able Engineering.

Able Engineering borrowed the money which it loaned to Bimini Run from the Beverly Bank by putting up a chattel mortgage on its machinery and equipment as security. Able Engineering's loan from the Beverly Bank was repaid in 1971. The $158,134.25 balance of the Able Engineering loan to Bimini Run has remained on the books and records of Bimini Run from the time of the loan's September 30, 1964, journal entry until the time of trial.

(d) *Adjustments to Bimini Run's account receivable from petitioner.*—As of September 30, 1964, Bimini Run's indebtedness to petitioner totaled $332,429.10. As a result of paying off the mortgage on the Calypso Liner and end-of-the-year intercompany adjustments by the auditors, the October 1, 1964, opening balance of Bimini Run's account payable to petitioner was $508,503.65.

The agreement for the exchange of the Calypso Liner for 400 acres of undeveloped land in Freeport was executed on September 30, 1964. The agreement specifically provided that the land would be subdivided, staked out, and developed into multiple-dwelling units and improved

---

[4] As mentioned earlier in our Findings, the receivable due from Bahamas Travel Corp. was originally recorded as $62,500. The record does not explain the difference in the two figures.

with roadways, sewerage, public utility facilities, parks, playgrounds, schools, and churches. Under a so-called lease arrangement, the agreement also gave Bimini Run a 10-year option to purchase an additional 300 acres of land in the same area at $3,000 an acre. The agreement further provided that Bimini Run could assign the agreement to Pine Ridge Estates, Ltd., a Bahamian corporation simultaneously formed by Bimini Run, and such assignment was made. The name of Pine Ridge Estates, Ltd., was changed to Freeport Ridge Estates, Ltd.

In the financial statement attached to the information return for Bimini Run filed with petitioner's consolidated income tax return for the taxable year ended September 30, 1964, a gain in the amount of $229,538 was reported on the exchange of the Calypso Liner for the Freeport land. This gain represented the excess of the reported fair market value ($750,000) of the Calypso Liner over Bimini Run's adjusted basis in the vessel. The $750,000 [5] figure was based on an appraisal of the Calypso Liner obtained on August 25, 1964, at the request of Bimini Run. In actuality the fair market value of the 400 acres received from the Grand Bahama Port Authority, Ltd., i.e., the amount realized on the exchange, was $1,240,000. In Freeport Ridge Estates, Ltd.'s financial statement submitted as part of its information return for the fiscal year ended September 30, 1964, Bimini Run's investment in Freeport Ridge Estates, Ltd., was reflected as a $225,000 loan payable and a $525,000 stock interest.

During the taxable year ended September 30, 1965, Bimini Run made numerous payments on its $508,503.65 account payable to petitioner. In payment of this account, Bimini Run assigned the receivable due from Freeport Ridge Estates, Ltd., and its stock in Freeport Ridge Estates, Ltd., on February 28 and March 31, 1965, respectively. Both of these Bimini Run assets were assigned to petitioner at their book values of $225,000 and $525,000, respectively. By the end of the September 30, 1965, taxable year, Bimini Run's general ledger account for petitioner showed that petitioner *owed* Bimini Run $204,368.77. Further end-of-the-year adjustments to this account brought the balance to $206,106.31.

Freeport Ridge Estates, Ltd., proved to be a profitable company for petitioner. In its information returns for the taxable years ended September 30 of 1965, 1966, and 1967, Freeport Ridge Estates, Ltd., reported net profits of $169,975, $614,991, and $1,335,252, respectively. Of the inventory of land held for sale by Freeport Ridge Estates, Ltd., all but three lots had been sold by September 30, 1971.

---

[5] Although the appraised value of the ship was stated to be $740,000, petitioner recorded $750,000 as the amount realized on the exchange. The $10,000 difference is not explained in the record.

(e) *Foreclosure on and litigation related to Tennessee land.*—Subsequent to the default by Bimini Run of Bahamas, Ltd., under the subcharter agreements of May 27 and May 31, 1962, petitioner and Bimini Run ordered the foreclosure by the trustee under the trust deed on the Tennessee land. Bimini Run bid in said property for $2,251 and was given a "Trustees Deed" dated February 23, 1963.

On November 1, 1962, Bahamas Travel Corp. defaulted on its obligations under the Talco note. After being unable to collect from the principal obligor, Talco called upon petitioner and Bimini Run as guarantors under the subcharter agreements of May 27 and May 31, 1962. Petitioner and Bimini Run refused to make payment, and on March 1, 1963, Talco filed suit against petitioner and Bimini Run in the United States District Court for the Southern District of Florida.

In an opinion dated January 23, 1964, the District Court ruled that petitioner and Bimini Run were liable to Talco in the amount of $146,000, plus interest at the rate of 6 percent from November 1, 1962. A judgment pursuant to said opinion was entered on March 18, 1964, and was affirmed on May 10, 1965, by the United States Court of Appeals for the Fifth Circuit. Payment pursuant to the judgment was made by petitioner and deducted in its income tax returns for the taxable years ended September 30, 1964, and September 30, 1965, in the amounts of $162,790 and $7,097.86, respectively.[6] By the end of the September 30, 1966, taxable year, Bimini Run's account receivable from petitioner was reduced to $36,638.40. This reduction was largely the result of a $169,887.86 charge against Bimini Run, which is the total amount paid by petitioner pursuant to the adverse judgment in the Talco note guaranty suit. A journal entry adjustment dated September 30, 1966, increased petitioner's obligation on the books of Bimini Run to $37,218.45.

After the exchange of the Calypso Liner and the transfer of the receivable and stock of Freeport Ridge Estates, Ltd., Bimini Run was inactive except for the acquisitions of certain securities and land in 1965 and 1966, as described below.

(f) *The transactions involving the Tennessee land, the oil stock, and the foundation bonds.*—On August 16, 1965, Bimini Run, Len M. Horton, and Edward R. Knezevich executed an agreement in which Bimini Run was to exchange the Tennessee land, which it acquired by foreclosure in 1963, for 100,000 shares of Horton's and Knezevich's common stock in Atlas-American Oil Corp. (hereinafter the oil stock),

---

[6] In a stipulation of facts entered into prior to trial, petitioner and respondent agreed that "deductions of $162,790.00 and $7,097.86 claimed in taxable years ended September 30, 1964, and September 30, 1965, respectively, as 'loss on guaranty' are not allowable and * * *, accordingly, ordinary income in taxable year ended September 30, 1966, is decreased by $169,887.86."

a Texas corporation, to be transferred and delivered to petitioner, care of Bimini Run. In the agreement, Horton and Knezevich represented that the stock was trading over the counter as of the date of the agreement at $2\frac{3}{8}$ to $2\frac{5}{8}$ per share and that if, on the date of closing, such stock were trading at less than $2\frac{3}{8}$ per share, then Horton and Knezevich agreed to deliver to petitioner, care of Bimini Run, "so many additional shares of the stock as shall compensate for the amount less than two and three-eighths $(2\frac{3}{8})$ for which it may be trading on said date of closing." Bimini Run recorded these 100,000 shares on its books at $2 per share, for a total of $200,000. Pursuant to the August 16, 1965, agreement, Bimini Run quitclaimed its rights to the Tennessee land to Horton and Knezevich on August 24, 1965.

On September 22, 1965, Bimini Run entered into a letter agreement with Nor Mel Investments, Inc., to exchange 35,000 shares of the oil stock for certain lots in Okeechobee County, Fla. Although Bimini Run received a warranty deed to such lots, Bimini Run, as of the time of trial, has been unable to obtain marketable title to the lots and is presently involved in litigation to clear its title. Bimini Run recorded these lots on its books at $70,000.

In its 1965 annual report to shareholders, published in April of 1966, petitioner advised its shareholders that it had two independent appraisals of the Okeechobee land, one dated September 30, 1965, setting a value of $77,400 and one dated October 1, 1965, setting a value of $78,200.

Subsequent to the close of the September 30, 1965, taxable year, Henry and Daniel Dubbin learned that the oil stock had discontinued trading. Henry Dubbin then contacted Horton and Knezevich, who had sold the oil stock to Bimini Run, and asked for a return of the Tennessee land given in the exchange. Horton and Knezevich had already sold the land to the A.M.E. Ministers Foundation (hereinafter sometimes the foundation), but agreed to deliver to petitioner and Bimini Run $250,000 in face amount of A.M.E. Ministers Foundation bonds (hereinafter the foundation bonds) as equivalent consideration.

After investigating the foundation, petitioner and Bimini Run agreed to accept the foundation bonds and, in exchange, to relinquish all their interest in the Tennessee land. This agreement was incorporated in a document dated December 15, 1965, between Horton, Knezevich, and Eastern Land Development Corp., a corporation controlled half by Horton and Knezevich and half by petitioner and Bimini Run.

Bimini Run received $250,000 in face amount of the foundation bonds on February 15, 1966. The bonds were issued in the name of petitioner, which immediately assigned them to Bimini Run, which carried the bonds on its books at $250,000.

Subsequently, Henry Dubbin received a letter dated July 1, 1966, from the president of the foundation, stating that the foundation was being dissolved and ordering the return of all bonds issued in the name of petitioner. The letter also stated that the deed to the Tennessee land was being returned by the foundation to the Eastern Land Development Corp. The bonds, still in petitioner's possession at the time of trial, have not been honored or paid.

The balance sheet of Bimini Run for the taxable year ended September 30, 1966, reflects the following:

*Assets*

| | | |
|---|---:|---:|
| Cash | | $6 |
| Investments: | | |
| 65,000 shares of Atlas-American stock | $130,000 | |
| A.M.E. Ministers Foundation bonds | 250,000 | |
| Lots in Okeechobee County, Fla | 70,000 | |
| | | 450,000 |
| Intercompany receivables (after yearend adjustments): | | |
| Canaveral International Corp | 36,638 | |
| Inter-Island Shipping Co | 3,665 | |
| | | 40,303 |
| Other deferred charges | | 75 |
| Total assets | | 490,384 |

*Liabilities*

| | | |
|---|---:|---:|
| Current liabilities: | | |
| Trade accounts payable | | $10,000 |
| Accrued expenses | | 30 |
| Intercompany payables (after yearend adjustments): | | |
| Able Engineering | $158,134 | |
| Canaveral Groves | 50,801 | |
| All others | 18,584 | |
| | | 227,519 |
| | | 237,549 |
| Stockholder's equity: | | |
| Capital stock | 500 | |
| Retained earnings | 252,335 | |
| | | 252,835 |
| Total liabilities | | 490,384 |

*Note:* These figures have been rounded to the nearest dollar amount.

In the financial statement attached to its September 30, 1966, information return, Bimini Run reported a net profit of $82,857 which resulted principally from the recognition of gain on its books from the receipt of the foundation bonds.

(g) *Landaria transaction.*—Landaria Corp. (Landaria) is a corporation having offices and/or representatives in Washington, D.C., whose business, stock ownership, and relationship with petitioner are

not shown. On November 21, 1966, Landaria offered to transfer to petitioner approximately 480,000 acres of land in Tennessee in exchange for all the common stock of Societe De Developpement et de Genie Civil Pour la Guyenne Francaise (a foreign subsidiary of petitioner's which owned mining rights in French Guiana), the $250,000 of the foundation bonds, and the 65,000 shares of the oil stock.

Landaria's offer was negotiated by Knezevich, whose relationship with that corporation is not shown. Petitioner accepted the offer on November 22, 1966. By a letter of the same date addressed to Knezevich, petitioner and Bimini Run agreed to release Knezevich from "any claims whatsoever which * * * [petitioner and Bimini Run] may have against you" if the pending transaction with Landaria were consummated.

On December 31, 1966, a warranty deed for the 480,000 acres of land in Tennessee was delivered to Robert Loewenthal, who was house counsel for petitioner and an escrow agent in connection with the Landaria transaction. Loewenthal agreed to hold in escrow the securities to be exchanged until Landaria delivered to petitioner evidence of good, marketable, and insurable title to the subject property. Such evidence was apparently not presented to the satisfaction of petitioner and, consequently, the transaction was not consummated. On March 14, 1967, Loewenthal returned the warranty deed to Landaria.

In its consolidated balance sheet included in its 1966 annual report to shareholders, published subsequent to the end of its 1966 fiscal year, petitioner reported that Bimini Run owned investments of $380,000 in securities. Note 5 to the financial statement explained that this item was composed of $250,000 in face amount of the foundation bonds and 65,000 shares of the oil stock recorded at a cost of $2 a share. Note 5 stated further:

While neither of these securities are listed on an exchange or traded over-the-counter, it is management's judgment that the recorded costs of these securities does [sic] not exceed current market value. On November 22, 1966, subsequent to the end of this fiscal year, the Company has entered into an agreement whereby in exchange for the above listed securities and all of the common stock of Societe De Devellopment Et De Genie Cure Pour La Guyane (a wholly-owned subsidiary), whose only assets consist of inactive mining properties in French Guiana, the Company will receive certain parcels of land in the State of Tennessee. The Company has appraisals on this tract of land which indicate value substantially greater than the carrying value of securities being exchanged for these properties.

By amendment to its petition, petitioner alleges that during the taxable year ended September 30, 1966, Canaveral Groves and Able Engineering incurred bad debt losses in the amounts of $117,301.26 and $158,134.25, respectively, because receivables due them from Bimini Run became worthless in that year.

### 3. *The Expenses Accrued by Canaveral Groves for Space and Transportation Provided Aboard the Calypso Liner by Bimini Run*

During the taxable years ended September 30, 1963, and September 30, 1964, Canaveral Groves was engaged in the sale of land located in Brevard County, Fla. Its sales efforts were accomplished through the mailing of brochures, extensive advertising, and listing with brokers. It also maintained a sales office in Miami, Fla.

During fiscal 1963 and 1964, Canaveral Groves utilized space aboard the Calypso Liner in connection with its sales activities. Salesmen of that corporation were assigned to the Calypso Liner to promote the sales of Canaveral Groves property to passengers on the vessel. The space provided for this purpose included a small table and some chairs for use by the salesmen in talking to the passengers, and a 3½-foot-wide and 2½-foot-high wall space on which an artist's representation of the Canaveral Groves land was hung.

Canaveral Groves also purchased tickets from Bimini Run for passage aboard the Calypso Liner. These tickets were purchased at cost and were given to actual and prospective purchasers of Canaveral Groves' land. The complimentary tickets were also distributed by Canaveral Groves in connection with special promotions, such as home shows. The distribution of the tickets was controlled so that their use would not interfere with the carriage by Bimini Run of its regular paying passengers. However, Canaveral Groves' use of the promotional tickets advertised the Calypso Liner itself, generated interest in the ship, and was beneficial to the Calypso Liner's passenger trade.

Bimini Run charged Canaveral Groves the amount of $3,000 in each of the taxable years ended September 30 of 1963 and 1964 for the informally leased space provided on the Calypso Liner. In the taxable year ended September 30, 1963, Bimini Run charged Canaveral Groves $2.50 for each ticket purchased for passage aboard the vessel; in the taxable year ended September 30, 1964, the charge per ticket was increased to $10 because the Calypso Liner began to sail to Freeport, Grand Bahama, which was a longer round trip.

The total charges to Canaveral Groves for space and tickets aboard the Calypso Liner were $13,000 in the taxable year ended September 30, 1963, and $8,280.93 in the taxable year ended September 30, 1964. The $13,000 charge was made directly to Bimini Run's account payable to Canaveral Groves and was deducted by Canaveral Groves as an advertising expense in the taxable year ended September 30, 1963. The $8,280.93 charge was erroneously made to Bimini Run's account payable to petitioner and was deducted as one of petitioner's advertising expenses in the taxable year ended September 30, 1964.

In the notice of deficiency, respondent determined that:

(f) It has not been established that deductions of $13,000.00 and $8,280.93 claimed in the taxable years ended September 30, 1963 and September 30, 1964 as promotion and entertainment expenses for amounts purportedly owed to your foreign subsidiary, Bimini Run, Ltd., are ordinary and necessary business expenses under Section 162 of the Internal Revenue Code.

OPINION

1. *The Applicability of Section 269 to the Acquisition of the Stock of Norango, Inc.*

(a) *Tax-avoidance purpose.*—Section 269 (a)[7] provides, in pertinent part, that if any person acquires control of a corporation, and the "principal purpose" for which such acquisition is made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, such deduction, credit, or other allowance shall not be allowed. More simply, the section "states in effect that, if A acquires B for the principal purpose of tax avoidance, then A cannot have the tax benefit which the ownership of B would otherwise entail." *Bobsee Corporation* v. *United States*, 411 F. 2d 231, 234 (C.A. 5, 1969).

For the section to be operative, the tax evasion or avoidance purpose must outrank, or exceed in importance, any other one purpose. S. Rept. No. 627, 78th Cong., 1st Sess. (1943), 1944 C.B. 1017. The determination of the purpose of an acquisition requires a scrutiny of the entire circumstances in which the transaction or course of conduct occurred, including the relationship of the transaction to the claimed consequent tax result. Sec. 1.269–3(a), Income Tax Regs. The burden of proof rests with petitioner. "Theoretically the question of purpose is purely subjective; pragmatically, however, the trier of fact can only determine purpose from objective facts." *Bobsee Corporation* v. *United States, supra* at 238.

---

[7] SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX.
  (a) IN GENERAL.—If—
    (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, * * *
    *     *     *     *     *     *     *
and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit, or other allowance. * * *

By Act of Feb. 26, 1964, Pub. L. 88–272, 78 Stat. 126 (sec. 235(c)(2)), the section was amended by inserting "then the Secretary or his delegate may disallow such deduction, credit, or other allowance" at the end of the first sentence in lieu of "then such deduction, credit, or other allowance shall not be allowed." The amendment is effective with respect to taxable years ending after Dec. 31, 1963.

The enactment in 1943 of the predecessor of section 269(a) was prompted by a desire to curb a growing market for defunct corporate shells with a history of large amounts of invested capital coupled with subsequent net operating losses. Such characteristics were effective income and excess profits tax shields for booming war enterprises. H. Rept. No. 871, 78th Cong., 1st Sess. (1943), 1944 C.B. 938; S. Rept. No. 627, 78th Cong., 1st Sess. (1943), 1944 C.B. 1016. But the section was intended to be broader in concept than a measure merely to prevent the trafficking in loss corporations. Its grander design, as expressed by Congress, was—

to codify and emphasize the general principle set forth in *Higgins* v. *Smith* (308 U.S., 473 * * *), and in other judicial decisions, as to the ineffectiveness of arrangements distorting or perverting deductions, credits, or allowances so that they no longer bear a reasonable business relationship to the interests or enterprises which produced them and for the benefit of which they were provided.

S. Rept. No. 627, 1944 C.B. at 1016.

We think the evidence in the instant case, weighed in the light of the foregoing principles, requires a holding that petitioner's principal purpose in acquiring Norango's stock was to receive the tax benefits of the vessel's sizable basis which otherwise would not have been enjoyed by petitioner and its affiliated group. Legitimate business reasons may have motivated petitioner to seek a vessel suitable for oceanographic and geodetic charter purposes. However, once petitioner's representatives became aware of Norango's corporate existence, viewed Norango's books, and discovered the yacht's undepreciated $769,632.75 cost basis, we think the overriding reason for acquiring Norango's stock was to reduce petitioner's consolidated income tax liability, present and prospective. See *Industrial Suppliers, Inc.*, 50 T.C. 635, 646 (1968); *Temple Square Mfg. Co.*, 36 T.C. 88, 94 (1961).

The evidence is unmistakably clear that petitioner's representatives, not the Woolworth estate, were responsible for casting the transaction in the form of an acquisition of Norango's stock. The evidence shows that Woolworth had advertised a yacht for sale, not a corporation owning a yacht, and that petitioner had decided to acquire a vessel for use in an oceanographic and geodetic charter business, not a corporation engaged in such business. There is some dispute as to whether Woolworth, prior to his death, had agreed to a stock-for-stock exchange. But the evidence is clear that after examining Norango's books, petitioner's representatives, including a New York attorney-accountant versed in tax matters, proposed to Malcolm, the

representative of the Woolworth estate, that the transaction be cast in the form of an exchange of some of petitioner's stock for Norango's stock and the notes payable to Woolworth.[8]

Petitioner's representatives made this proposal notwithstanding the risk of undisclosed liabilities ordinarily attendant upon the acquisition of the stock of a small corporation. Also, the notes payable in the amount of $961,484.89, recorded on Norango's books, ordinarily would have dictated that only the corporation's assets be acquired. However, by purchasing Norango's notes payable and stock and contributing the notes to the capital of the corporation, petitioner tailored the transaction to make the purchase of Norango's stock economically feasible. It would have been simpler to have acquired the yacht directly, and petitioner has given no worthwhile explanation as to why the more roundabout route was taken. The most reasonable inference is that petitioner's representatives wanted the transaction cast in this form for tax-avoidance reasons.

The potential tax benefits from the stock acquisition were so disproportionate in relation to the consideration paid for the stock as to cause a major distortion in petitioner's income. For the Norango stock, petitioner traded 949 shares of its non-dividend-bearing, non-voting preferred stock which were convertible to 20,878 shares of petitioner's common shares. The conversion could not take place until sometime between December 31, 1966, and February 1, 1967. On the day of the closing of the sale, petitioner's common stock was selling at a high of 11¼ and a low of 10¾. Due to the restrictions on the preferred stock's convertibility, the non-dividend-bearing character of the preferred stock, and the uncertainty of the number of shares of preferred stock allocable to the notes acquired in the transaction, we have found that the value of the yacht and of the shares of stock petitioner exchanged for the Norango stock was $177,500.[9]

---

[8] Malcolm, representative of the Woolworth estate, testified that petitioner's representatives proposed that the transaction take the form of a sale of stock:

Q. Did you bring up the possibility of selling the stock of Norango, Inc.?
A. I didn't bring it up.
Q. Did you suggest that?
A. I didn't bring it up. They asked me for it.

Though Henry Dubbin's testimony on the issue is evasive, he testified at one point:

"[Mr. Field, the New York attorney-accountant who assisted in the negotiations] may have been called in on tax matters. I don't really recall him being called in specifically on tax matters. I recall him being—discussing them with our comptroller and our auditing division."

[9] We have found the value of the yacht at the time of petitioner's acquisition of the Worango stock in August 1962 was $177,500, the value of the stock given in the exchange. We recognize that petitioner sold the yacht in December 1963 for $250,000. However, this sale followed extensive renovations and refurbishment and a demonstration of the feasibility of the use of the vessel—described by one of the witnesses as a "white elephant"—for commercial purposes.

For this outlay of property worth $177,500, petitioner's consolidated group [10] obtained potential tax deductions in the form of depreciation over the life of the vessel or a loss on a subsequent sale, computed by use of an adjusted basis of $769,632.75 (the cost of the yacht and furniture and fixtures as carried over from the books of Norango). At the prevailing corporate tax rates, the tax windfall from Norango's high basis in the yacht so far exceeded petitioner's investment in Norango's stock that the consolidated group could have realized a net profit even if the newly acquired yacht had sunk on its first voyage.[11] This is the kind of subversion of the basis-loss provisions to distort income that section 269 was enacted to prevent. Sec. 1.269–2(b), Income Tax Regs.; *Scroll, Inc.* v. *Commissioner*, 447 F. 2d 612, 618–619 and fn. 15 (C.A. 5, 1971).

Petitioner hammers away on the point that it intended to, and did, use the vessel for business purposes. However, the fact that petitioner would have acquired the yacht in the absence of a tax-avoidance motive is not determinative. Sec. 1.269–3(a), Income Tax Regs. See *F. C. Publication Liquidating Corporation* v. *Commissioner*, 304 F. 2d 779, 780–781 (C.A. 2, 1962), affirming 36 T.C. 836 (1961); *Industrial Suppliers, Inc.*, 50 T.C. at 646. Section 269 is directed to the principal purpose for the acquisition of control of a corporation, not the absence of a business purpose in acquiring a corporation's assets. That petitioner planned to use the *yacht* for business reasons does not alone explain the principal purpose underlying its acquisition of the *stock*.

In *Industrial Suppliers, Inc.*, *supra*, Caldwell and associates acquired for $20,000 the stock of a corporation which had a merchandise inventory with a book value of $165,475 and which had a long history of net operating losses. The purchasers thereupon used the

---

[10] Sec. 1.1502–31A(b)(9)(ii), Income Tax Regs., relating to consolidated returns, provides:

There shall be excluded in the case of a subsidiary corporation which became a member of the affiliated group subsequent to January 1, 1954, those deductions from gross income otherwise allowable with respect to—* * * sales or exchanges of property subject to the provisions of section 1231, * * * to the extent that such deductions otherwise allowable are attributable to events preceding the date upon which such corporation became a member of the group, * * *

Since the deterioration in the value of the yacht from the cost of $769,632.75 to the $177,500 in petitioner's stock given in the exchange occurred prior to the date on which Norango (as Sea Research) became a member of the affiliated group, this regulation appears to deny the deduction of the higher basis. Sec. 269 has also been applied where a consolidated group acquired a subsidiary for tax-avoidance purposes. *R. P. Collins & Co.* v. *United States*, 303 F. 2d 142, 145 (C.A. 1, 1962); *Elko Realty Co.* v. *Commissioner*, 260 F. 2d 949 (C.A. 3, 1958), affirming per curiam 29 T.C. 1012 (1958); *American Pipe & Steel Corp.* v. *Commissioner*, 243 F. 2d 125, 127–128 (C.A. 9, 1957), affirming 25 T.C. 351 (1955).

[11] For its taxable year ended Sept. 30, 1964, during which the yacht was sold, petitioner had a net operating loss, which was disallowed in part by respondent. The disputed deficiency is for the taxable year ended Sept. 30, 1966. The net operating loss for the earlier year is alone sufficient, if sec. 269 does not apply, to extinguish the determined deficiency and provide additional carryovers to later years.

corporation in carrying out a highly profitable joint venture. Rejecting a contention that section 269 was not applicable because the purchasers' principal purpose was to acquire the corporation's inventory, this Court said (50 T.C. at 646):

We have no doubt that Caldwell was interested in acquiring petitioner's inventory at what he considered to be a bargain price and, on first impression, this would appear to be a valid, business purpose for the acquisition of petitioner's stock. We are not convinced, however, that the tax benefits to be derived from the carryover of previous net operating losses was not the principal purpose for acquiring the inventory *through the purchase of petitioner's stock* rather than by a simple purchase of the inventory itself. The purchase of the stock and the various manipulations which this involved, as well as the subsequent utilization of petitioner in the * * * [joint] venture, thereby creating additional profits against which the loss carryovers could be applied, belies Caldwell's testimony that the tax benefits were not a consideration for the purchase of the stock.

Similarly, in *Bobsee Corporation* v. *United States*, 411 F. 2d at 239, the court dismissed an argument that section 269 did not apply because each of seven corporations was created for a business purpose, stating: "To establish a principal non-tax motive * * * [the owner of the taxpayer] had to justify the creation of *seven* corporations; however, the reason she gave would only justify the formation of a single corporation." By analogy, that petitioner wanted to acquire a vessel for business purposes does not show that its principal reason for acquiring the stock of Norango was not tax avoidance.

Petitioner argues that the claimed loss on the sale of the yacht occurred after the Norango stock was acquired and that there is substantial disagreement among the Courts of Appeals as to whether section 269 is applicable at all to postacquisition losses. The disagreement petitioner refers to is whether section 269 applies to losses which accrue *economically* after affiliation. Compare *Herculite Protective Fabrics Corp.* v. *Commissioner*, 387 F. 2d 475 (C.A. 3, 1968); and *Zanesville Investment Co.* v. *Commissioner*, 335 F. 2d 507 (C.A. 6, 1964); with *Hall Paving Co.* v. *United States*, 471 F. 2d 261 (C.A. 5, 1973); *Borge* v. *Commissioner*, 405 F. 2d 673 (C.A. 2, 1968) (and cases cited therein), certiorari denied sub nom. *Danica Enterprises, Inc.* v. *Commissioner*, 395 U.S. 933 (1969); *Temple Square Mfg. Co.*, 36 T.C. 88 (1961). The economic loss in the instant case, i.e., the difference between the basis of the yacht carried on Norango's books and the value of the consideration exchanged by petitioner for Norango's stock, had already accrued at the time of Norango's affiliation, and the Courts of Appeals all agree that section 269 may be used to disallow such "built-in" losses.

In holding against petitioner, we do not suggest that section 269 requires a taxpayer to acquire a corporation's assets rather than its

stock merely because a stock acquisition produces more favorable tax results. In given cases, the courts have recognized that acquiring the stock of a corporation may be the only, or the most feasible, way of handling the transaction. *Hawaiian Trust Co., Ltd.* v. *United States*, 291 F. 2d 761 (C.A. 9, 1961). See, e.g., *Glen Raven Mills, Inc.*, 59 T.C. 1, 15 (1972); *Clarksdale Rubber Co.*, 45 T.C. 234, 240–241 (1965); *Baton Rouge Supply Co.*, 36 T.C. 1, 13 (1961). But when section 269 is placed in issue, it does require a showing that the most favorable tax route, when that route involves the acquisition of a corporation, was principally motivated by non-tax-related business reasons. Petitioner has shown no substantial business reasons for acquiring Norango's stock rather than the yacht. The evidence is persuasive that the transaction was so cast in an effort to obtain the tax benefits of the yacht's high basis which petitioner otherwise would not have enjoyed.

In cases where the purchase price paid for the stock of a corporation is substantially less than the aggregate basis of the corporation's assets, the burden of proof imposed on the taxpayer can be difficult to sustain. See sec. 269(c); [12] *Scroll, Inc.* v. *Commissioner*, 447 F. 2d at 618. In the instant case, petitioner exchanged preferred stock worth $177,500 for stock in a corporation with assets having a $769,632.75 basis. Through such use of Norango's basis, unrelated to petitioner's cost, petitioner sought, among other things, to reduce its consolidated tax liability by taking excessive depreciation deductions and by converting an economic gain on the sale of the yacht into a deductible tax loss. The practical effect of the transaction, if section 269 does not apply, was to enable petitioner's consolidated group to offset current business earnings from other sources against a preacquisition economic loss suffered by Norango while the yacht was used for nonbusiness purposes. See *Scroll, Inc.* v. *Commissioner, supra* at 617. Such a distortion of petitioner's tax liability is by itself prima facie evidence of the principal purpose of tax evasion or avoidance, and petitioner has failed to produce convincing evidence proving otherwise.

---

[12] SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX.

(c) PRESUMPTION IN CASE OF DISPROPORTIONATE PURCHASE PRICE.—The fact that the consideration paid upon an acquisition by any person or corporation described in subsection (a) is substantially disproportionate to the aggregate—

(1) of the adjusted basis of the property of the corporation (to the extent attributable to the interest acquired specified in paragraph (1) of subsection (a)), or of the property acquired specified in paragraph (2) of subsection (a); and

(2) of the tax benefits (to the extent not reflected in the adjusted basis of the property) not available to such person or corporation otherwise than as a result of such acquisition,

shall be prima facie evidence of the principal purpose of evasion or avoidance of Federal income tax. This subsection shall apply only with respect to acquisitions after March 1, 1954.

(b) *Determination of basis.*—Having concluded that petitioner acquired Norango's stock for tax-avoidance purposes within the meaning of section 269, we must now decide the tax consequences of that conclusion. In its consolidated income tax returns for its taxable years ended September 30 of 1962, 1963, and 1964, petitioner claimed depreciation deductions on the yacht, and in the 1964 return claimed a loss on the vessel's sale. Both the depreciation and the loss deductions were computed by using the $769,632.75 basis of the yacht, as shown on Norango's books, with some minor adjustments. In the notice of deficiency, respondent reduced the depreciation deductions and determined that petitioner realized a gain of $74,855.71 rather than a loss of $511,726 on the sale of the vessel. In making these computations, respondent used a basis of $177,500, with adjustments, for the vessel.

Section 269(a) disallows, in the described circumstances, the full amount of a "deduction, credit, or other allowance * * * [which the taxpayer] would not otherwise enjoy." [13] Section 269(b),[14] however, permits the Secretary or his delegate, in any case to which section 269 (a) applies, to allow any part of the deduction, credit, or allowance and to disallow the remainder, if he determines that such allowance will not result in the proscribed evasion or avoidance of Federal income taxes. That is what was done in the instant case. Respondent used the cost to petitioner of the Norango stock ($177,500) as the cost basis of the yacht and then, in computing depreciation and gain or loss, made appropriate adjustments to basis for the cost of improvements and for allowable depreciation. In making this determination, respondent treated petitioner's acquisition of the stock as if petitioner had directly acquired the yacht, consistent with the following explanation of the predecessor of section 269(b) in S. Rept. No. 627, 78th Cong., 1st Sess. (1943), 1944 C.B. 1018:

Subsection (a) provides for the disallowance in its entirety of the deduction, credit, or allowance which was the objective of the tax avoidance and evasion devices, but in order that the disallowance may be consistent with the purpose and appropriate scope of the section, subsection (b) authorizes the allowance of such part of the deduction, credit, or allowance as will not result in the avoidance or evasion of taxes sought by the acquisition. *A proper result can be simply reached under paragraph (1) of subsection (b) in the more widely advertised schemes by reflecting in the deductions, credits, and allowances the purchase in substance by the acquiring interests of the assets which it was the design of the scheme so artfully to conceal.* * * * [Emphasis added.]

---

[13] The term "allowance" refers "to anything in the internal revenue laws which has the effect of diminishing tax liability." Sec. 1.269–1(a), Income Tax Regs.

[14] SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX.

(b) POWER OF SECRETARY OR HIS DELEGATE TO ALLOW DEDUCTION, ETC., IN PART.—In any case to which subsection (a) applies the Secretary or his delegate is authorized—

(1) to allow as a deduction, credit, or allowance any part of any amount disallowed by such subsection, if he determines that such allowance will not result in the evasion or avoidance of Federal income tax for which the acquisition was made; * * *

Accordingly, respondent looked through the corporation Norango and determined petitioner's cost basis for the yacht to be reflected by the value of the stock which petitioner exchanged to acquire control of Norango. This procedure gives petitioner a tax benefit equal to the full amount of its investment but denies it any tax benefits it would not have enjoyed had it acquired the yacht directly. This treatment of the transaction accords with subsections (a) and (b) of section 269. Respondent's determinations in this respect, therefore, are sustained.

2. *The Deductibility Under Section 166(a) of the Intercompany Debts Owed by Bimini Run to Canaveral Groves and Able Engineering*

Petitioner alleges that, during its fiscal year ended September 30, 1966, the following debts owed its subsidiaries by Bimini Run became wholly worthless: (1) $117,301.26 owed Canaveral Groves, and (2) $158,134.25 owed Able Engineering. On this ground, the amended petition claims a bad debt deduction in the amount of $275,435.51. We hold that petitioner is not entitled to the coveted deduction.

Section 166(a) [15] allows as a deduction any debt which becomes worthless during the taxable year. To support the allowance, the taxpayer must show a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. Sec. 1.166–1(c), Income Tax Regs.; cf. *Evans Clark*, 18 T.C. 780, 783 (1952), affirmed per curiam 205 F. 2d 353 (C.A. 2, 1953). In addition, the taxpayer must show that the debt had current or potential value at the beginning of the taxable year and that it lacked value at the end of that year. *Herbert W. Dustin*, 53 T.C. 491, 501 (1969), affd. 467 F. 2d 47 (C.A. 9, 1972). As a general rule, this burden of establishing worthlessness may be carried by showing that some identifiable event occurred during the taxable year which effectively destroyed the debt's value. *Herbert W. Dustin, supra* at 501; *Charles W. Steadman*, 50 T.C. 369, 376–377 (1968), affd. 424 F. 2d 1 (C.A. 6, 1970), certiorari denied 400 U.S. 869 (1970); *W. A. Dallmeyer*, 14 T.C. 1282, 1291–1292 (1950); *Sterling Morton*, 38 B.T.A. 1270, 1278–1279 (1938), affd. 112 F. 2d 320 (C.A. 7, 1940).

In ascertaining whether a debt is worthless, the facts must be viewed realistically. *United States* v. *White Dental Co.*, 274 U.S. 398, 403 (1927). Where the debt transaction is between affiliated corporations,

---

[15] SEC. 166. BAD DEBTS.

(a) GENERAL RULE.—
(1) WHOLLY WORTHLESS DEBTS.— There shall be allowed as a deduction any debt which becomes worthless within the taxable year.
(2) PARTIALLY WORTHLESS DEBTS.—When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.

as in the instant case, all the facts must be carefully scrutinized to see whether the loss has economic reality or is the result of the shuffling of funds or assets between related entities. *C. M. Gooch Lumber Sales Co.*, 49 T.C. 649, 656 (1968).

The balance sheet of Bimini Run as of September 30, 1966, set forth in our Findings, does not reflect the absence of assets which could have been applied on the debts owed Canaveral Groves and Able Engineering. That balance sheet, taken from Bimini Run's own information return, reflects total assets of $490,384 and, indeed, shows a net worth of $252,835. Petitioner argues, however, that, notwithstanding the balance sheet, the Atlas-American stock (face amount of $130,000) and its foundation bonds (face amount of $250,000) became worthless in that fiscal year and that these identifiable events rendered Bimini Run insolvent and unable to pay any of its debts. An analysis of our detailed Findings shows that petitioner's argument is unsound for several reasons which follow.

(a) *Assets available for application on debts.*—Bimini Run's September 30, 1966, balance sheet, after the accountants' adjustments, reflects intercompany receivables due Bimini Run from petitioner ($36,638.40) and Inter-Island Shipping Co. ($3,665.92) totaling $40,-304.32. The balance sheet also shows the lots in Okeechobee County with a value of $70,000. In its 1965 annual report, petitioner advised its shareholders that it had two independent appraisals of the lots, one setting the value at $77,400 and the other at $78,200. As late as 1971, this land was valued at $70,000 in reports to the Securities and Exchange Commission. The $110,304.32 total of these two items (the intercompany receivables and the lots in Okeechobee County) would have been available for application on the two debt claims. Even if petitioner is correct in every other respect on this issue, the maximum deduction allowable would be $165,131.19 ($275,435.51 minus $110,-304.32). See *Carpenter* v. *Commissioner*, 415 F. 2d 806 (C.A. 4, 1969), affirming per curiam a Memorandum Opinion of this Court; *R. H. Barbour*, 29 T.C. 1039, 1046–1047 (1958).

(b) *Transfer of Freeport Ridge Estates investment.*—As detailed in our Findings, Bimini Run traded the Calypso Liner for the Freeport Ridge Estates land. Although the land had a fair market value of $1,240,000, Bimini Run recorded its total investment in Freeport Ridge Estates at only $750,000. When Bimini Run transferred its Freeport Ridge Estates investment to petitioner in settlement of its account payable to petitioner, it did not receive credit for the full fair market value of the land ($1,240,000) but received credit for only the book value ($750,000). The result was that the account balance owing from petitioner to Bimini Run was understated by $490,000. An adjustment to correct his understatement would increase Bimini Run's

account receivable from petitioner as of September 30, 1966, from $36,638.40 to $526,638.40. With such an increase, Bimini Run would have been fully solvent, regardless of the values of the Atlas-American oil stock and the foundation bonds.

Respondent describes this manipulation of Bimini Run's accounts as an understatement of $490,000 of accounts receivable. Whether it is properly so described or is more accurately characterized as a manipulation of the assets of an affiliated corporation is not decisive. In either case, such manipulation of either accounts or assets may not become a predicate for a bad debt deduction. Cf. *East Coast Equipment Co.*, 21 T.C. 112, 121–122 (1953), affd. 222 F. 2d 676 (C.A. 3, 1955). This is not "the manner in which transactions are handled in the normal and ordinary course of doing business." *Malone & Hyde, Inc.*, 49 T.C. 575; 578 (1968).

(c) *Alleged worthlessness of oil stock and foundation bonds.*— Finally, we are not convinced that petitioner's or Bimini Run's rights in connection with either the Atlas-American oil stock or the foundation bonds were wholly worthless on September 30, 1966. We think these securities had or reflected substantial value at that time. Our view is confirmed by petitioner's 1966 annual report to its shareholders, which states that " it is management's judgment that the recorded costs of these securities [$250,000 for the bonds and $130,000 for the oil stock] does [sic] not exceed current market value."

Shortly after Bimini Run exchanged the 100,000 acres of the Tennessee land for the Atlas-American oil stock it had received from Horton and Knezevich, as detailed in our Findings, Henry and Daniel Dubbin learned that the oil stock had ceased trading on the American Stock Exchange. They promptly tried to rescind the transaction, but the land had already been sold by Horton and Knezevich for the foundation bonds. On December 15, 1965, Horton and Knezevich agreed to, and did, give Bimini Run the $250,000 in face amount of the foundation bonds in return for petitioner's and Bimini Run's relinquishment of any interest they might have in the Tennessee land.

In November 1966, after the close of the fiscal year for which the disputed bad debt deduction is claimed, petitioner attempted to exchange with Landaria, represented by Knezevich, the Atlas-American oil stock, the foundation bonds, and the stock of a French Guiana mining subsidiary for 480,000 acres of land in Tennessee. Petitioner and Bimini Run stated that if this transaction were consummated, Knezevich would be released from "any claims whatsoever which * * * [petitioner and Bimini Run] may have against you."

Because of the above facts, we are not satisfied that petitioner's claims under the Atlas-American oil stock and the foundation bonds were worthless in petitioner's fiscal year ended September 30, 1966.

Although there is little evidence to suggest the nature or amount of the claim against Knezevich, even if the Atlas-American oil stock and the foundation bonds as such were in actuality worthless, we think the claim—though not shown on Bimini Run's balance sheet—had substantial value.

In short, the full story of Bimini Run's economic condition on September 30, 1966, is not told by its balance sheet. When the assets and liabilities are reconstructed in order to conform to the facts in the record, the intercompany receivables substantially exceed the intercompany payables, and Bimini Run is demonstrably solvent. Bimini Run has not declared bankruptcy, and proving that Bimini Run was insolvent due to the intercompany liabilities was the only argument made by petitioner to support its claim that the Able Engineering and Canaveral Groves debts were worthless. Petitioner has not shown that the debts became worthless during the taxable year ended September 30, 1966.

3. *Substantiation of the Expenses Accrued by Canaveral Groves for Space and Transportation Provided Aboard the Calypso Liner by Bimini Run*

Respondent contends only that petitioner has not substantiated the challenged expenses accrued by Canaveral Groves and petitioner. At trial, petitioner's witnesses generally gave only vague testimony as to the times when the space on the Calypso Liner was used by Canaveral Groves' salesmen. And petitioner did not establish the number of tickets actually sold or used by Canaveral Groves in connection with its promotional activity. Henry Dubbin testified that lists had been maintained of people who had been given complimentary tickets, but no documentary evidence pertaining to either the ticket expenses or the space rental was presented.

Although credible testimony establishing the general nature of the expenses and the fact that *some* expense was incurred appears in the record, the only concrete testimony was from a former Canaveral Groves real estate salesman who testified he made twice-a-week trips on the Calypso Liner in 1963 for a 6- or 7-week period. Under the circumstances, the best we can do is make a rough approximation of the advertising and promotional expenses actually incurred by Canaveral Groves aboard the Calypso Liner. *Cohan v. Commissioner*, 39 F. 2d 540 (C.A. 2, 1930). Accordingly, Canaveral Groves is entitled to deduct $8,000 for the taxable year ended September 30, 1963, and $4,500 for the taxable year ended September 30, 1964.

To reflect the foregoing conclusions and the agreed disposition of numerous other issues,

*Decision will be entered under Rule 155.*